**RICH PRODUCTS CORPORATION, Plaintiff,**

v.

**MITCHELL FOODS, INC. and Frank S. Mitchell, Defendants.**

Civ. No. 9597.

United States District Court W. D. New York.

June 30, 1965.

Popp & Sommer, Buffalo, N. Y., for plaintiff; Kenneth R. Sommer, Buffalo, N. Y., Kenyon & Kenyon, New York City, Hugh A. Chapin and Edward W. Greason, New York City, of counsel.

Bean, Brooks, Buckley & Bean, Buffalo, N. Y., Malcolm K. Buckley, Buffalo, N. Y., of counsel, for defendant.

BURKE, Chief Judge.

### FINDINGS OF FACT

1. Plaintiff is the owner of all right, title, and interest in the patent in suit, United States Letters Patent No. 2,868,-653, issued January 13, 1959, having obtained title by assignment from the joint inventors, Holton W. Diamond and Eugene L. Powell.

2. The patent covers liquid emulsions which change, when whipped, in appearance and characteristics into a firm nonpourable product suitable as a salad and dessert topping.

3. The whippable emulsions of the patent have at least four essential ingredients: (a) water, (b) an edible fat, (c) a substituted cellulose of a specified type, (d) at least one of a specified group of emulsifiers. Sweeteners or flavoring substances may be, and are, normally added.

4. The edible fat may be derived from animal or vegetable sources. The substituted cellulose used is one which has been modified to replace some of the

hydrogen atoms in the chemical composition with methyl groups. The emulsifiers used are set forth in their chemical terminology in the specifications and claims. These emulsifiers have been identified in the patent and at the trial by their trade names, Spans, Tweens, Myverols and Myrj.

5. Claims 1 through 4 each recites the use of these four essential ingredients. Claim 1 recites the use of water, fat, a substituted cellulose and any one or more of the four types of specified emulsifiers. Claims 2, 3 and 4 each include water, fat, a substituted cellulose and an emulsifier. The emulsifier in Claim 2 is Spans, in Claim 3 Tweens, and in Claim 4 Myverol.

6. The desirable qualities of a whipped topping are: reliable whipping in a relatively short time; a consistently high yield of whipped topping as compared to a liquid emulsion; a consistently stable topping which will not shrink, weep, or collapse; a relatively long storage period without spoiling. The proof establishes that the whipped topping covered by the patent has all of these desirable qualities. Because the emulsion covered by the patent does not contain protein, it has a long storage life without becoming rancid or sour.

7. The prior patents and publications relied on by the defendants at the trial were substantially the same in disclosure as those which were before the Patent Office during the prosecution of the patent application. During the prosecution of the application in the Patent Office there was before the Patent Office the question whether a specific emulsifier (glyceryl monostearate), which was specified as an optional ingredient in one of the prior art patents (British 555,361), was the same or the equivalent of one of the emulsifiers covered by the patent in suit. This is the same question on which defendants base their prior art defense. The Examiner was convinced by evidence that the glyceryl monostearate in the prior art patents was different from Myverol in the patent in suit, which is defined as "refined complex mixtures resulting from metathetical reaction of a complete glyceride fat with an excess of glycerol." The evidence that convinced the Examiner was experiments conducted by Diamond, where two emulsions were made in exactly the same manner and having exactly the same ingredients, except that in one emulsion a commercial grade glyceryl monostearate (Aldo 33) was used. The results of these experiments were submitted to the Examiner in an affidavit of Diamond, accompanied by pictures of the resulting products and literature describing the respective emulsifying agents in detail. After this submission, the Patent Office granted the patent. At the trial, plaintiff's expert testified that he observed and assisted in conducting experiments identical to those that were conducted as the basis of Diamond's affidavit that was filed in the Patent Office. The results of his own experiments were explained by plaintiff's expert at the trial. The results, including photographs and the resulting products themselves, show that the functional differences between Aldo 33 and Myverol 18–85 are substantial. The proof establishes that there are marked chemical differences between Aldo 33 and Myverol 18–85 and that these substances are substantially different emulsifying agents from a functional standpoint.

8. At the trial, defendants produced testimony regarding nine ex parte experiments made for the express purpose of the trial, to show that Diamond's statements in his affidavit submitted to the Examiner were incorrect, and that glyceryl monostearate of British Patent No. 555,361 was the same as Myverol 18–85 of the patent in suit. Of the nine experiments seven were entirely uncorroborated. The other two were uncorroborated as to whipping after overnight storage. None of the nine experiments used Myverol 18–85. No photographs showing the results of the experiments were produced. These nine experiments were a selected nine out of thirty-nine experiments conducted for the same purpose. No evidence was produced as to the

results of the other thirty experiments. Of the nine experiments, only three dealt with glyceryl monostearate (Aldo 33) referred to by Diamond in his affidavit submitted to the Examiner. The other six used other products identified as glyceryl monostearate produced by another manufacturer. This evidence produced by the defendants, to show that Diamond's statements in his affidavit submitted to the Examiner were incorrect, was not convincing.

9. Defendants rely heavily on British Patent No. 555,361, which was extensively considered by the Patent Office in the prosecution of the application for the patent in suit. The British patent teaches the preparation of a cream substitute prepared in two steps. First, an aqueous gum base is prepared by mixing an aqueous suspension of an emulsifying agent "A", which consists of a harmless chloride, a harmless salt of tri-basic acid, and an edible vegetable gum such as sodium alginate with an emulsifying agent "B" comprising a cellulose derivative; secondly, the aqueous gum base is blended with a fat selected from a specified group of oils, and water is added to complete the composition. The basic composition of the cream substitute of the British patent consists of water, fat and emulsifying agents "A" and "B". The British patent teaches that emulsifying agents "A" and "B" must be used in each instance. Neither of these specified emulsifying agents of the British patent was comparable to any of the four classes of emulsifying agents specified in the patent in suit. There is no ingredient in the patent in suit comparable to emulsifying agent "A". The British patent also states that the compound glycerol monostearate may be used as an optional ingredient, without showing its function as an emulsifier or otherwise. The glycerol monostearate, which is stated to be an optional ingredient in the British patent, is not the same emulsifier that is described in the patent in suit, viz., "refined complex mixtures resulting from the metathetical reaction of complete glyceride fat with an excess of glycerol." The glycerol monostearate of the British patent is comparable as an emulsifying agent to commercially available glycerol monostearate such as Aldo 33. The difference in function of these emulsifiers was shown in Diamond's affidavit submitted to the Patent Office. It was also shown at the trial. The experiment was repeated during the progress of the trial and the result shown at the trial. The glycerol monostearate of the British patent was not the same as Myverol 18–85 of the patent in suit. It is stated in the patent in suit that the Myverol is purified by distillation under high vacuum. Such a process was not available until the early 1950's, whereas the British patent was published in August, 1943.

10. Defendants also rely on British Patent 646,484. This patent differed from British 555,361 only in the type of fats specified. This prior art reference adds nothing to the teaching of British Patent 555,361. British Patent 646,484 was also before the Patent Office during the prosecution of the application for the patent in suit.

11. Defendants also rely on an article, "Certain Partial Ester Emulsifier Levels in Food," by C. F. Pratt. This article deals with the safe levels of use of four classes of emulsifiers in a wide variety of applications. Although it discloses the uses of these emulsifiers in many products, it does not mention a whipped topping containing a substitute cellulose.

12. The prior art citations referred to above and relied on by the defendants do not teach a method to produce the product covered by the claims of the patent in suit. The disclosures covered by the patent in suit were of an inventive and patentable character and were not anticipated by any prior patents or publications.

13. Diamond's affidavit submitted to the Patent Office did not misrepresent the state of the art when the application for the patent was pending. The representations made to the Patent Office were true. The Examiner was not im-

properly induced to allow the claims of the patent in suit.

14. The patent in suit defines a new and useful product which represents a material advance over the prior art. This is shown in part by the defendants' adoption as soon as the disclosures of the patent were available. The defendants secured a copy of the patent in June, 1959.

15. The whippable emulsions manufactured and sold by both plaintiff and defendants before they had knowledge of the disclosures of the patent, were comprised of water, fat, protein-containing material and an emulsifier. These products which contained protein tended to develop undesirable flavors, due to rancidity or souring, after a short time and did not give a consistently high yield, comparable to the emulsions of the patent.

16. Subsequent to the disclosures of the patent, both plaintiff and defendants commenced to make and sell an emulsion without protein content. The proof establishes that the defendants had, prior to the disclosures of the patent, attempted without success to develop a whippable emulsion using substituted celluloses. These unsuccessful attempts were performed by the defendant, Frank S. Mitchell. He had had a number of years of practical experience in this field. The advantages of the patent disclosures in providing a non-protein type of whippable emulsion with desirable stability, short whipping time, consistently high yield, and long storage life, were readily recognized by the defendants. They promptly started to use the patent disclosures in their commercial products.

17. In answers to plaintiff's interrogatories sworn to by the defendant, Frank S. Mitchell, infringement of Claim 1 was admitted. In these interrogatories plaintiff asked the defendants, in language taken from Claim 1, whether their ready-to-use topping (Mitchell's Scotch Topping), as manufactured by or for defendants at any time during the six-year period preceding this suit, contained each of the four essential ingredients as set forth in Claim 1. The defendants answered in the affirmative. In response to further interrogatories, defendants conceded that they included in their Mitchell's Scotch Topping one or more of the Claim 1 emulsifiers, except Myrj, and that the proportions of the four essential ingredients in this product came within the combinations covered by Claim 1.

18. Defendants were also asked in interrogatories the same questions regarding manufacture of their whipped topping base, which is diluted by the consumer before being whipped (Mitchell's Whip Filling Base). Defendants' answers established infringement of Claim 1 by this product.

19. Since March, 1960, defendants have produced and sold ready-to-use whippable emulsions which infringe Claims 2 and 3, and whippable emulsion bases which infringe Claims 2, 3 and 4.

20. In the face of answers to interrogatories referred to above, the defendants at the trial denied infringement, the sole basis for such denial being their contention that the emulsifier used by the defendants, hydroxy-propyl methyl cellulose, does not come within the definition of a substituted cellulose as used in the patent, viz., "a cellulose substituted with alkyl groups comprising not more than two carbon atoms and at least part of such groups being methyl." The substituted cellulose used by defendants is covered by this language. Moreover, the substituted cellulose used by defendants is the chemical and functional equivalent of methyl cellulose and methyl ethyl cellulose which are specifically described in the patent in suit.

21. Hydroxypropyl methyl cellulose is a cellulose substituted with both methyl groups and hydroxypropyl groups, with a ratio of substitution being about six methyl substitutions to every one hydroxypropyl substitution. Hydroxypropyl methyl cellulose is chemically a variant of methyl cellulose having a minor substitution of hydroxypropyl groups in addition to methyl groups and falls within the language of the claim

"a cellulose substituted with alkyl groups comprising not more than two carbon atoms and at least part of such groups being methyl." The overwhelming proportion of such substitutions in this cellulose are methyl groups. Only a minor proportion are hydroxypropyl groups.

22. Defendants' expert at the trial testified that the language of the claim limits the type of substituted cellulose to either a cellulose substituted with methyl or ethyl or methyl-ethyl groups and no other. This interpretation of the claim is rejected as being contrary to ordinary English usage. The language of the claim means that some of the substitutions must be methyl. It does not mean that there may be no other substitutions. Hydroxypropyl methyl cellulose which contains predominately methyl substitutions is included within the language of the claim, even though it also includes a minor substitution of hydroxypropyl constituents.

23. Hydroxypropyl methyl cellulose is the chemical and functional equivalent of methyl cellulose.

24. The commercial products of the defendants which they now produce and which they did produce at and prior to December, 1962, when Mitchell signed the answers to the interrogatories referred to above, infringe the patent in suit.

25. The evidence establishes that the defendant, Frank S. Mitchell, was the chief executive officer of Mitchell Foods, Inc. He was in active and direct control of the operations of Mitchell Foods, Inc. He is therefore personally responsible for the infringement.

## CONCLUSIONS OF LAW

■ 1. The patent in suit, United States Patent No. 2,868,653, issued January 13, 1959, including Claims 1 through 4, is a valid patent.

2. The Patent Office Examiner was not improperly induced to allow the claims of the patent.

3. The products which the defendants have manufactured and sold in their commercial operations after the issuance of the patent in suit and prior to and after the filing of this suit, without permission of the plaintiff, incorporated the invention of the patent and infringed some or all of Claims 1 through 4.

■ 4. The defendant, Frank S. Mitchell, is personally liable jointly with the defendant, Mitchell Foods, Inc. He was the person actively controlling and directing the operations of Mitchell Foods, Inc., including the acts of infringement.

5. Plaintiff is entitled to an injunction restraining the defendants from further infringing the patent and to an accounting for damages to compensate for the infringement, with interest and costs.

Settle decree on 3 days' notice.