**REEVES BROTHERS, INC., Plaintiff,**

**v.**

**U. S. LAMINATING CORP., and Travis Rauch, Defendants.**

**No. 62-C-1248.**

United States District Court
E. D. New York.

Jan. 23, 1968.

Kane, Dalsimer, Kane, Sullivan & Smith, New York City, for plaintiff; by Robertson, Bryan, Parmelee & Johnson, Haynes N. Johnson, Roland T. Bryan, Vincent A. Mallare, Stamford, Conn., of counsel.

Irving Moldauer, New York City, for defendants; Henry L. Burkitt, New York City, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., by Abraham D. Caesar and Stanley H. Cohen, Philadelphia, Pa., of counsel.

BARTELS, District Judge.

This action involves two inventions made by John W. Dickey, the first in March, 1956 and the second in May, 1957, upon which three patents were issued and duly assigned to Reeves Brothers, Inc.

The First Patent (No. 2,957,793) relates to lamination of polyurethane foam to fabric by the use of flame heat. The Second Patent (No. 3,057,766) relates to an improvement in the method and apparatus for such lamination. The Third Patent (No. Re. 25,493) is a reissue of the Second Patent. Reeves instituted this action under 35 U.S.C.A. § 271 against U. S. Laminating Corp. and Travis Rauch, its general manager and sole owner (since 1965), for infringement of these patents.

In addition to the conventional defenses of patent invalidity for anticipation or obviousness and infringement, defendants interposed in a shotgun approach a number of other defenses predicated upon invalidity or non-infringement, including (1) insufficiency of disclosure, 35 U.S.C.A. § 112; (2) failure to make a full and complete disclosure for the purpose of deceiving the public; (3) addition of new matter by amendment, 35 U.S.C.A. § 132; (4) file wrapper estoppel; (5) abandonment of the Second Patent Application; (6) unauthorized reissue of the Second Patent, 35 U.S.C.A. § 251; (7) prior public use of the invention covered by the First Patent; (8) theft of the invention by the patentee; and (9) patent misuse, unfair competition, and violation of the anti-trust laws in licensing and promoting the patents. Before the trial was completed, which consumed 61 trial days recorded in approximately 9,000 pages of testimony, a number of these defenses were either dismissed by the Court or abandoned by the defendants.[1] Although a resolution of one or more of the remaining defenses would have terminated this dreary and acrimonious litigation without consideration of the other defenses, the procedure apparently preferred in this circuit dictates consideration of all issues which might become relevant if error is com-

---

1. The Court dismissed defenses under (5), (6), (7), (8) and (9) for failure of proof. At the close of the trial the defendants withdrew six grounds upon which they relied in the Pretrial Order relating to the following defenses: Insufficiency of disclosure with respect to all patents; public deception by failing to make complete disclosure as to the Second and Reissue Patents; new matter by amendment to the Second and Reissue Patents, and non-infringement of the Second and Reissue Patents.

mitted in adjudicating any other issue. Ling-Tempco-Vought v. Kollsman Instrument Corp., 2 Cir. 1967, 372 F.2d 263, 265.

### Background of the Dickey Patents

Polyurethane foam of the polyester type (polyurethane foam) was first manufactured in Germany and was not available in the United States in commercial quantities until late 1954. At that time the foam was used for soundproofing, insulation for jacket linings, furniture stuffing, carpet underlay, and cleaning aids and sponges. Curtiss-Wright Corporation was an early manufacturer of polyurethane foam in this country and in 1956 was promoting its use as carpet underlay, especially for wall to wall broadloom carpeting. Because of the very strong frictional adhesive qualities of the foam, it was difficult to unroll the carpet over the foam underlay without the foam bunching and possibly tearing, which was an obstacle to its acceptance as carpet underlay. To overcome this difficulty Curtiss-Wright experimented with possible ways to eliminate the friction between the foam and the carpet, including dusting the foam with soapstone, coating the foam with wax, and attaching muslin to the foam by the use of starch adhesives. None of these remedies proved effective. Efforts to laminate polyurethane foam to cloth by adhesives or by sewing had been attempted in textile oriented uses but had not proved too successful commercially.

In March, 1956 Dickey, a chemical engineer, was employed by Curtiss-Wright as a trouble shooter. He had no previous experience with polyurethane foam, and his first major assignment was to help solve this carpet underlay problem by finding a commercially practical way to attach muslin cloth to the foam. Dickey's immediate suggestion was to fuse the surface of the foam and laminate the same to the cloth. This possibility was discussed with others in the research department of Curtiss-Wright who had more experience with polyurethane foam. Dickey was informed that the suggestion was impractical because the foam melted at 450° F. and would decompose when heated to a temperature sufficient to fuse it and moreover such temperature upon lamination would cause damage to the fibers or filaments of the fabric which could not withstand heat above 300° F. Dickey was not discouraged by this information but on March 21, 1956 passed a small piece of polyurethane foam through a Bunsen burner and discovered that the fused foam when pressed against a piece of fabric would adhere to it without damaging the fabric.[2]

The problem then remained as to how Curtiss-Wright could commercially take advantage of this newly discovered process of foam lamination. In an effort to reach a solution Dickey designed and constructed a flat bed machine (illustrated in Fig. 1 of the First Patent) for the production of foam fabric flame laminates. This apparatus consisted of a flat bed conveyor which carried the foam underneath a burner causing it to become soft and tacky and thereafter conveyed the foam under a roller under which there was drawn at the same time fabric material which was consequently pressed against the soft and tacky foam thereby causing it to adhere to the fabric. However, the foam when exposed to heat or flame on this machine tended to wrinkle and accordingly produced imperfect laminates. While wrinkling did not significantly affect the strength of the bond nor affect the use of the laminate as carpet underlay, it was objectionable from a cosmetic viewpoint in the textile industry

2. Dickey supported his testimony as to March 21, 1956 by his own notebook entries. In addition, on March 29, 1956 a member of Curtiss-Wright's patent department signed a description and drawing of the invention made by Dickey; consequently the prefiling invention date relates back at least to March 29, 1956.

Dr. Karl Hager also referred to a prefiling invention date as to some time in March, April or May, 1956. Sufficient corroboration therefore exists as to March 29, 1956. United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 2 Cir. 1935, 77 F.2d 263.

and particularly as garment linings. To obviate this difficulty Dickey in May, 1957 conceived and reduced to practice the idea of tensioning the foam on a roller or drum before and after lamination. This was accomplished by a machine (illustrated in Fig. 1 of the Second Patent) which operated a drum on the periphery of which the web of foam was tensioned before and after reaching the burner. The fabric material was carried simultaneously and tensioned longitudinally along a conveyor towards and against the drum after the foam passed the burner and was soft and tacky thereby causing a laminate which was further arcuately tensioned around the drum after the contact of the two materials.

### First Dickey Patent and File History

Dickey filed the application for his First Patent on September 28, 1956. In substance, it claims a method of laminating a sheet of foamed polyurethane plastic material of the polyester type by contacting the same with a gas flame to heat the surface layer to at least 450°F. to fuse the surface layer and to render the same soft and tacky and pressing a sheet of fabric material upon this soft and tacky layer after the layer has cooled to a temperature below the fusion temperature of the foam, or after it has cooled to a temperature below that which would damage said sheet of porous material or after said surface layer has cooled to a temperature not injurious to said fabric sheet.

In view of the many defenses interposed to this patent, the file history of its application in the Patent Office is important. The original application contained seven method claims, and three article claims. Of the method claims, only Claim 2, which was later cancelled, and Claim 7, which became Claim 3 of the patent as finally issued, stated (pp. 10–11) that the second material was applied to the "soft tacky surface while said surface is in a supercooled state" (retaining its liquid properties after being cooled below its melting point). All

claims were rejected as unpatentable over the Matheson Patent (p. 14). The application was then amended to drop the article claims and to add "supercooling" to all of the method claims, and the patentee stated that "an essential feature of applicant's invention not disclosed in any of the prior art references, [is] viz., the application of the material which is to be bonded to the plastic material, to the surface of the plastic material while said surface is in a supercooled state", thereby allowing lamination to materials such as fabrics which would ordinarily be damaged by exposure during lamination to the 450°F. or to temperature required to render polyurethane foam soft and tacky (p. 17). The claims were again rejected by the Patent Office (p. 20).

In response thereto, patentee argued that Matheson disclosed "*immediate* pressing of the heated surface against the material to which it is to be bonded" (emphasis is applicant's) and that there is no teaching that "in order to avoid damage to the material to be bonded to the plastic, the apparatus and process be so arranged that when said material is brought into contact with the heated surface of the plastic the temperature of the latter has dropped below the normal melting point of the plastic and yet said surface is still adhesive, i. e., that such contact occurs while said surface is in a supercooled state" (p. 23). The claims were again rejected as unpatentable (pp. 26–27). Applicant then emphasized to the Patent Office that the fused foam surface is "then allowed to cool to a supercooled state" and that "there is *no* disclosure or suggestion in Matheson that there is *sufficient delay* between the heating of the surface and the pressing of the two sheets together for said surface to cool to a supercooled state" (emphasis is applicant's) (pp. 28–29). The Patent Office then issued a final rejection, stating "in view of the teaching * * * of applicant's specification that plastic surfaces assume the supercooled state within a second after heating it is considered that such state is necessarily present in Matheson" (p. 33).

Applicant thereupon further amended his application, substituting "cooled" for "supercooled" in the specifications and changed the language of the claims from "is in a supercooled state" to "after the latter has cooled to a temperature below the fusing temperature of the foamed polyurethane" (Claim 4, which became Claim 1 of the patent as issued) or "after the latter has cooled to a temperature below that which would damage said sheet of porous material" (Claim 5, which became Claim 2) or "layer has cooled to a temperature not injurious to said fabric sheet" (Claim 7, which became Claim 3) or "has cooled to a temperature below the freezing temperature of said polyurethane foam and is still in a tacky condition" (Claim 11, for which was substituted Claim 12, which became Claim 4 of the final patent). The applicant also cancelled the reference in the original application that the "cooled" or "supercooled" state could be achieved "in fractions of a second" (pp. 37–40). In his remarks the applicant stated that, when fused, the surface of the foam "is inherently converted to simpler compounds * * * which has a freezing temperature below that of the fusion temperature of the polyurethane foam and sufficiently low that the fused material remains tacky at a temperature which is not injurious to fabrics", and that this was what was meant by "supercooling", although that term "is not strictly applicable where the fused material is converted into a simpler compound with a lower freezing temperature" (p. 40). The application was then rejected for the fifth time (p. 47). After rewriting Claim 11, which finally became Claim 4, the four claims which remained were finally allowed on August 16, 1960 (p. 53).

### Second Dickey Patent and File History

Dickey filed the application for his Second Patent on September 23, 1957. This patent claims improvements over the method and apparatus of lamination disclosed in the First Patent. Furthermore, the claims of the Second Patent are not restricted to the lamination of polyurethane foam but encompass the lamination of any "markedly flexible and elastic foamed first material". Although one of the purposes of the method and apparatus improvements was the elimination of wrinkling, this improvement is mentioned only in the specifications and not in the claims of the Second Patent. The pertinent claims are as follows:

Claim 1 describes an improved method consisting of preheating the confronting surface of a flexible backing second material (the fabric web) prior to its contact with the adhesive surface of the foam, said preheating temperature conditioning the second material to minimize chilling of the adhesive surface.

Claims 6–8 define improvements in the method of laminating foam to fabric, and Claims 2–5 are for an apparatus to carry out this improved method. The apparatus claims are described in terms of the process, and the process claims are described in terms of the apparatus. In essence, these claims provide means for downwardly feeding the foam under some longitudinal tension onto and at least partly around the periphery of a horizontally rotating, water-cooled drum in frictional engagement therewith, directing intense heat in a narrow band across the extent of said drum to render adhesive only the outward surface of the foam during the first part of its peripheral travel and at a position outwardly and lower than the first point of peripheral contact of said foam. This accomplishes the lamination of the foam and the fabric, which is also under longitudinal tension, by contacting said adhesive surface with the fabric during said peripheral travel, the two materials being brought into contact along a line arcuately removed from said band of application of heat to said foam. Thereafter the laminated materials are maintained under longitudinal tension in order to urge both against the drum while said materials are becoming adjusted and the adhesive is setting (see Exhibit A attached hereto).

The defenses interposed to this patent and its reissue also make its file history important. The application as originally filed contained some twenty-five inartfully drawn method and apparatus claims (pp. 10–14). These claims were rejected some four times, the last rejection being deemed final (pp. 18, 23, 30, 37). After this last rejection the claims were by amendment entirely rewritten and reduced to eight. Although none of the twenty-six claims included in the application prior to this amendment referred to directing or means for directing intense heat in a narrow band across the extent of the drum, such a phrase was introduced into all the rewritten claims which covered heat lamination, except the one rewritten claim which referred to preheating the fabric material. This last amendment also introduced language in the apparatus claims to the effect that the two materials were to be contacted at a point "lower than and arcuately removed from the point of application of heat" and phraseology into the method claims that the two materials were to be contacted "at a point lower than the point of application of heat to said first material" (pp. 42–46). The fact that lamination should take place at a point on the drum arcuately removed from the band of the application of heat was not spelled out in clear, precise terms in the original filed claims, but there is language to that effect or from which such an inference is necessary in Claims 7, 10, 18 and 21. The rewritten claims also provided for further arcuate travel to cause the laminated materials to become fully adjusted, which was more explicit than the language of the pertinent original claims (Claims 1–9 and 12–21), stating that "the webs are caused to adhere to each other during their joint travel around the drum".

In support of the last amendment the patentee stated that one of the four real improvements to the lamination art embodied in his application is that "the invention specifies a particularly advantageous way of heating the surface of the foam material to cause it to be adhesive while minimizing the exposure of the laminating material to the heat" (p. 48). He added that the provision for further arcuate travel was "the central feature of the claims" (p. 49). The Patent Office responded that all these amended claims appeared allowable (p. 51). By a subsequent amendment the patentee dropped all inclusive apparatus and lamination method claims not limited to heat lamination and slightly modified the language of the remaining heat lamination method claims (pp. 52–54), which amendments were formally allowed on January 11, 1962 (p. 58).

On June 4, 1962, by means of a post allowance amendment under Rule 312,[3] the patentee sought primarily to effect certain changes in the directions of the movement of the foam and fabric in the lamination process by a change in the language of the existing specifications and claims and by adding eight new claims (pp. 61–71). On June 26, 1962 the Patent Office recommended entry of many of the minor changes in the specifications and claims, but refused to recommend entry of the additional new claims because of the additional work required on the part of the Patent Office (p. 72). The final fee was paid by the patentee on July 9, 1962. On September 17, 1962 the patentee sought the permission of the Commissioner under Rule 313 to have the application withdrawn from issue "for the purpose of abandoning the application in favor of a continuation" filed on August 13, 1962 (p. 74). This application was denied as being untimely on the ground that an application cannot be withdrawn after the date and number had been given to a patent and that the application had not fallen within the exception of an "extraordinary situation" as described in Rule 183 permitting the Commissioner to waive the requirement of the rules (p. 78). Upon application for reconsideraton, this ruling

---

3. Rules 312, 313 and 183 refer to the Patent Office Rules of Practice. All references to sections are to the United States Patent Act, 35 U.S.C.A.

was reaffirmed, the Patent Office stating that the applicant had available to him a remedy set forth in "the sections of the statute relating to amendment and correction of patents (35 U.S.C. 251–255)" by reissue (pp. 88–89).

### Third or Reissue
### Dickey Patent

According to the suggestion of the Patent Office, on January 17, 1963 the patentee applied under Sections 251–255 for a reissue of the Second Patent, adding to the original nine claims of the Second Patent four new claims, which application was granted on December 10, 1963. In substance, the four new claims, 10 to 13, sought to remove the orientation or directional language pertaining to the process and method present in the original nine claims relating to the position of the drums on the machine, which in this case is of little significance.

Claim 13 dropped all reference to the limitation of further arcuate travel after lamination but did refer to the wrinkling problem in its preamble.

### I

### DEFENSES BASED UPON
### THE FILE HISTORY

### Legality of the Reissue
### Patent, § 251

In the interest of clarity, the defense predicated upon illegality of the Reissue Patent will be considered immediately.

As above indicated, the claims sought to be added to the Second Patent by the Rule 312 amendment were denied by the Patent Office and the patentee thereafter sought to abandon the application in favor of a continuation in part application. Because two and one-half months had elapsed since the rejection of the Rule 312 Amendment, the Patent Office refused to allow the withdrawal as untimely, and the Second Patent was thereupon issued. The Patent Office, however, accepted the patentee's explanation that the delay in filing the abandonment was due to inadvertence and suggested that the patentee add the claims by re-

issue. The question then is whether an inadvertent delay in seeking to correct an error in allowed claims constitutes itself an error justifying reissue of the patent under Section 251. Defendants contend that it does not, because the patentee knew of the error in the claims before the patent was issued and had a remedy available to correct the same (thus distinguishing Ex Parte Goldsby, Pevere, Clarke and Hatch, P.O.Bd.App. 1944, 62 USPQ 198). But the error to be considered is the error of inadvertent delay and not the error in the claims.

Defendants rely upon Ex Parte Ziherl and Kish, P.O.Bd.App.1957, 116 USPQ 162, for their position. In that case applicants sought to assert additional claims by means of a post-allowance amendment which was denied by the Patent Office. They did not thereafter seek to withdraw the application in favor of a continuing application, thereby acquiescing in the issuance of the patent. The Board, dismissing the applicants' explanation as being wholly without merit, upheld the examiner's position that the applicants were "presumed to have elected to withdraw their contention that these two claims are allowable to them" and held that the applicants did not accept their patent through "error" as called for in Section 251.

This case is quite different from *Ziherl*. Here the patentee did seek to abandon his application but was not permitted to do so. Additionally, the Court, in the absence of evidence to the contrary, is entitled to presume as correct the implicit finding of the Patent Office that Dickey's delay in applying for an abandonment was an error and unintentional. Helms Products, Inc. v. Lake Shore Mfg. Co., 7 Cir. 1955, 227 F.2d 677; Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., E.D. Pa.1958, 169 F.Supp. 1, affirmed, 3 Cir. 1959, 268 F.2d 395, cert denied, 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151. The reissue provisions of the Patent Act are essentially equitable and remedial in nature and must be liberally construed to afford inventors adequate protection. In

re Wesseler, Cust. & Pat.App.1966, 367 F.2d 838; Application of Willingham, Cust. & Pat.App.1960, 282 F.2d 353. Although an error in failing to correct a previously discovered error is unusual within the terms of Section 251, the language of that section does not preclude such a reissue, which in this case was proper.

▮ Subsidiarily, defendants also contend that Claims 2–8 of the Reissue Patent are unenforceable under the doctrine of Langdon v. Saltser & Weinsier, Inc., 2 Cir. 1961, 288 F.2d 50, because they are identical with Claims 2–8 of the Second Patent which the patentee claimed were defective in order to secure the reissue, and hence the patentee is estopped to rely upon them. A reading of the patentee's remarks to the Patent Office in support of his Rule 312 Amendment (pp. 61–71) in the Second Application and the patentee's oath in support of the reissue demonstrates that Dickey in this case never maintained that Claims 2–8 were defective as written and issued in the Second Patent, but only that they were subject to multiple interpretations of scope, one of which was too restrictive. Langdon, supra, is therefore inapposite and the Dickey Patent was legally reissued.

### Insufficiency of Disclosure and Deception of Public

As defenses to all patents the defendants urge invalidity on the grounds of insufficiency of disclosure, contrary to the requirements of 35 U.S.C.A. § 112, and deception of the public by failure to include other disclosures necessary in the patent specification.

▮ A review of the principles applicable is necessary. Section 112 requires that the invention and the manner and process of using it must be described in full, clear, concise, and exact terms in order to enable a person skilled in the art to make and use the same. But these words must be reasonably interpreted and considered in the light of the evidence in the case and the nature of the invention. If the disclosure from the specifications and drawings is sufficient to enable a person of ordinary skill in the particular art to make and use the invention, that is sufficient. Application of Folkers, 1965, 52 CCPA 1269, 344 F.2d 970; Schick Dry Shaver v. R. H. Macy & Co., S.D.N.Y.1939, 28 F.Supp. 1013, mod., 2 Cir. 1940, 111 F.2d 1018. Disclosures, however, are not addressed to persons who are ignorant of the subject matter but to those who have a degree of skill and knowledge in the field. Phrases and terms which might be sufficiently clear and concise to the skilled artisan might well be imprecise and unclear to the ignorant. The fact that a person skilled in the art might find it necessary to experiment with several tests in order to use the invention, does not vitiate the patent. American Patents Development Corp. v. Carbice Corp. of America, 2 Cir. 1930, 38 F.2d 62, reversed on other grounds, 1931, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; A. B. Dick Co. v. Barnett, 2 Cir. 1923, 288 F. 799. On the other hand, if extensive experimentation is necessary before the disclosure of the invention becomes apparent, the patentee has evidently failed to describe the invention in such "full, clear, concise, and exact terms" as required by the statute. Zoomar, Inc. v. Paillard Products, S.D. N.Y.1957, 152 F.Supp. 328, affirmed, 2 Cir. 1958, 258 F.2d 527, cert. denied, 358 U.S. 908, 79 S.Ct. 237, 3 L.Ed.2d 230; Application of Diedrich, 1963, 50 CCPA 1355, 318 F.2d 946.

▮ There seems to be little doubt that inequitable conduct or bad faith, such as intentional misrepresentations in proceedings before the Patent Office, may result in unenforceability of the patent. Precision Instruments Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, but in that case the standard of proof was not a preponderance of the evidence but proof "to a reasonable degree of certainty". Corning Glass Works v. Anchor Hocking Glass Corp., D.C.Del. 1966, 253 F.Supp. 461, mod., 3 Cir. 1967, 374 F.2d 473. With these authorities in

mind each Dickey Patent will be considered.

## A. *First Dickey Patent*

The alleged insufficiency of disclosure with respect to this patent consists of the failure to disclose (a) the rate of heating; (b) the length of time of the application of heat to foam; and (c) the length of time between heating and lamination.

▓▓▓ A reference to the patent is a sufficient answer to these claims of non-disclosure for it discloses that the heating should be superficial to render the surface of the foam soft and tacky without altering the structure of the remaining or unheated foam; that a ribbon type burner employing an air-gas mixture may be used; that the requisite degree of heating may be obtained by properly regulating the speed of the operation and the height of the burner above the foam; and that the cooled state of the foam surface is achieved in a very short period of time so that the nip roll which presses the fabric to the foam may be located in close proximity to the burner as shown in the patent diagram. The time limits for heating and cooling are variables, depending upon the speed at which the machine is operated, the intensity of the particular burner employed and the amount of burn-off desired for the particular lamination. These variables may be properly adjusted by any experienced laminator to suit his requirements and also the particular machine used. It would be difficult, if not impossible, to provide specific rates of heating which would be meaningful on any but the patentee's machine as used when the application was filed. The disclosure in this patent complies with Section 112 and was sufficient to permit anyone skilled in the art to practice the invention with relatively simple trials to regulate his particular machine without the specifics demanded by the defendants. The grounds for this attack upon the patent are baseless.

Defendants further contend that the patentee was guilty of inequitable conduct or bad faith in failing to disclose that lamination should take place in a fraction of a second after the foam is fused in order to obtain the best laminate. To this catalogue of objections the defendants further assert that the term "polyurethane foam of the polyester type" was insufficiently described and that the patentee was guilty of inequitable conduct in failing to disclose that polyurethane foam of the polyether type could not be used. There is no ambiguity in the description of the polyurethane foam of the polyester type, nor was the patentee guilty of any bad faith in failing to negate the use of the polyurethane foam of the polyether type, nor in failing to specify that lamination must take place in a fraction of a second. Such defenses are frivolous.

## B. *Second and Reissue Dickey Patents*

▓▓▓ Defendants contend that Claims 1, 6–8, and 11–13 of these patents are defective because of the failure to disclose (a) the amount of preheating necessary to minimize chilling or the method to achieve it; and (b) the amount of tension required to adjust and set the laminate during its further arcuate travel.

The specific objections (a) and (b) relate to matters which would be obvious to a person skilled in the art and are without merit. The patentee does not claim a specific optimum temperature with respect to preheating, but only that preheating will aid bonding, describing a possible heating device that can be used for this purpose. As to the amount of tension required, the specification teaches that the best lamination occurs when the foam web is tensioned just enough to have it lay wrinkle free on the laminating drum. This assertion together with the description of the apparatus are sufficient disclosures to enable the apparatus and method inventions of the Second Patent to be practiced.

Defendants also included in their attack upon these two patents some of the insufficiency of disclosure objections involving the criticality of polyurethane foam of the polyester type and the failure to negate the use of polyurethane foam of the polyether type, which have already

been dismissed as to the First Patent. These defenses must be dismissed because the second Dickey invention is not restricted to polyurethane foam but includes "elastic flexible foamed" materials, the disclosure of which in the Second and Reissue Patents is sufficient.

### Fraud and Deception

Defendants have repeated certain allegations of inequitable conduct and bad faith with respect to all the patents. There is no need to refer to all the specific charges because there has been no evidence offered or presented to the effect that the patentee, or anyone acting on his behalf in the prosecution of these patents, deceived or had any intention to deceive the public or any member thereof in connection with any of these patents. These charges were carelessly made and the defenses are accordingly dismissed as totally unsupported.

### *New Matter*

■■■■ Defendants suggest invalidity of all patents upon the ground that new matter was added by amendment to both the First and Second Dickey Patents in violation of 35 U.S.C.A. § 132. It is well established that an applicant for a patent cannot by an amendment broaden his original application to include new matter such as an invention, process or apparatus not theretofore described (Schriber-Schroth Co. v. Cleveland Trust Co., 1938, 305 U.S. 47, 57, 59 S.Ct. 8, 13, 83 L.Ed. 34), particularly if a public user has intervened. Muncie Gear Works v. Outboard Marine & Mfg. Co., 1942, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171. But mere explanatory or narrowing statements representing no departure from the original invention cannot be treated as new matter. Novadel Process Corporation v. J. P. Meyer & Co., 2 Cir. 1929, 35 F.2d 697. The same is true concerning amendments for the purpose of clarity and definiteness. Application of Wright, 52 CCPA 1185, 1965, 343 F.2d 761; H. H. Robertson v. Klauer Mfg. Co., 8 Cir. 1938, 98 F.2d 150, 152–153; Lee v. Congress Beauty Equipment Co., D.Mass.1943, 48 F.Supp. 827. Im-

plicit in the action of the Patent Office in permitting the amendment, is a determination that the amendment does not contain new matter within the meaning of the Act and this determination is presumptively correct. Helms Products, Inc. v. Lake Shore Mfg. Co., supra; Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., supra. The issue is whether the changes specified by the plaintiff in the amendments are in fact new matter.

### A. *First Dickey Patent*

■■■■ The new matter which defendants claim was added to the First Dickey Patent by amendment consists of the following:

(a) Cancellation from the specification of plastic materials usable in carrying out the process and the addition to the specification and claims of the limitation that only polyurethane foam of the polyester type could be used.

This amendment was a limiting and not an enlarging amendment and added nothing new. Plastic materials were eliminated because heat lamination of those materials was known in the prior art. Similarly, the polyurethane foam to be used was limited to foam of the polyester type because polyurethane foam of the polyether type available to the patentee at that time would not heat laminate.

(b) Cancellation of the disclosure that lamination should take place in a fraction of a second.

The original application stated that the heated material achieved a supercooled state "in a very short period of time *which may be measured in fractions of a second*" (emphasis added). This would allow lamination in a fraction of a second after heating. The cancellation of the phrase "which may be measured in fractions of a second" was simply a recognition of the fact that although the time for cooling and lamination after passage of the foam under the burner would take place "in a very short period of time", the time might vary somewhat from machine to machine above a frac-

tion of a second. Such amendments do not change the substance of Dickey's invention or add new matter.

### B. *Second and Reissue Dickey Patents*

■ Similar untenable claims were made by defendants concerning the alleged new matter added to the Second and Reissue Patents as follows:

(a) The addition to the specification that the best lamination occurs when the foam web is tensioned only enough to permit it to lay wrinkle free on the laminating drum.

The original application disclosed that the foam web should be placed under "suitable tension". The patentee made this disclosure more specific by adding that the best lamination occurs when the web is tensioned only sufficiently to have it lay wrinkle free on the drum. Obviously, this does not change or add to the original disclosure that suitable tensioning of the foam web will prevent wrinkling and provide a better laminate.

(b) The addition to the specification that the first material must be a foam.

This inclusion adds nothing new but merely restricts the nature of the invention in conformity with the problem actually solved and also in conformity with the prior art.

(c) The addition to the claims that direct intense heat in a narrow band across the extent of the drum is applied to render the foam adhesive.

The original specification described as a suitable means of heating a "transverse nozzle-type gas heater" and provided that while the flame emanating from the nozzle will play upon the foam web, it avoids any substantial heating of the fabric web. The type of burner recommended is illustrated in Fig. 1 of the patent. The

later addition to the *claims* that intense heat is applied in a narrow band across the extent of the drum is no more than a particularization of the disclosure of the original specification and adds nothing new in violation of Section 132. Accordingly, the addition of similar language to the specification in the Reissue Patent was not improper under Section 251.[4]

Up to this point practically all the objections interposed by defendants were of an insubstantial nature demonstrating the inability of the defendants to distinguish between insubstantial and substantial defenses, thus unnecessarily consuming the time of the Court. The important and relevant defenses will now be considered.

### *Patentee's Alleged Disclosure of Equivalence*

■ Actual equivalency is not sufficient to negate nonobviousness. It must be art recognized or obvious, and this is a question of fact. Application of Ruff, 45 CCPA 1037, 1958, 256 F.2d 590; Application of Hinman, 51 CCPA 1433, 1964, 333 F.2d 226; see also Graver Tank & Mfg. Co. Inc. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 856, 94 L.Ed. 1097. Admission by the applicant of equivalency is not binding, if, as a matter of fact, it can be established that the equivalency has not been disclosed in the prior art or is nonobvious. In this case the defendants attempt to bind plaintiff by alleged admissions of equivalency, denying it an opportunity to prove otherwise. This position cannot be sustained. If, however, an "applicant for a patent, without knowing how it is going to affect his interest, makes a statement which he later attempts to deny when he has found it is against his interest, he will not be believed unless he produces convincing

---

4. There was another *de minimis* contention by defendants that new matter was included by the addition to the claims in the Second Patent and to the specification of the Reissue Patent that the preheating of the backing material (fabric web) must be carried to a point where the backing material is temperature conditioned to minimize chilling of the adhesive. The original specification used the phraseology "avoid chilling", which was sufficient to support the later addition to the claims and specification of the phraseology "minimize chilling". Defendants' contention is highly technical and likewise untenable.

proof of his later assertion." Application of Ruff, supra, p. 596; Application of Hinman, supra, p. 230.

### A. *First Dickey Patent*

Defendants contend that the patentee admitted that polyurethane foam was the equivalent of plastic materials such as cellulose acetate, cellulose butyrate, nylon, the styrenes and any of the vinyls, although by subsequent amendment the references to plastic materials were eliminated and the invention limited to polyurethane foam of the polyester type. Plaintiff has, in response thereto, offered substantial evidence that polyurethane foam of the polyester type is not equivalent to the other materials in that polyurethane foam has a much higher fusion temperature which creates problems of possible damage to fabrics and that its reaction upon fusing is quite different from that of the thermoplastics (linear polymers) mentioned because the fused polyurethane foam (a covalent, crosslinked polymer) decomposes, reacts chemically with the fibers or filaments of the fabric, and recombines in a different form whereas thermoplastics merely undergo phase changes in lamination and the bond is purely a physical one.

 Without deciding whether these alleged admissions of equivalency are in fact equivalents because disclosed in the prior art or obvious, it is clear that the plaintiff has adduced sufficient evidence of nonequivalency to relieve it of any admissions of equivalence in the original disclosure, leaving the matter open for decision. However, belief of equivalence on the part of the patentee may be relevant in determining the knowledge of the man skilled in the art, a subject to which reference is later made.

### B. *Second and Reissue Dickey Patents*

Defendants contend that the patentee admitted that heat lamination is the equivalent of adhesive lamination and that lamination of a foam is the equivalent of lamination of a film, despite subsequent amendments which eliminated reference to adhesive lamination and limited the invention to foams. In response plaintiff has offered evidence that (i) the wrinkling problem sought to be solved by the Second and Reissue Patents is caused by a difference in thermal expansion between the heated surface of the foam and the relatively cool backside, and that therefore adhesive lamination does not present the same problem and is not an equivalent, and (ii) the wrinkling due to thermal expansion is much more severe with respect to foams than with films because the former are usually thicker than films and are better insulators, which tends to increase the temperature differential between the face and backside of foams above that of films. Under the circumstances any admission by the plaintiff is not binding.

### File Wrapper Estoppel

This defense is relevant only in connection with the First Patent. One of the critical features in the Dickey method patent is the claim that the fabric is contacted with the soft and tacky layer of the foam only after the foam has substantially cooled. Critical to both the issue of validity and infringement of this patent is the language of the claims to this effect. As earlier related, when Dickey filed his original application all the claims were rejected as being covered by the prior art. In order to circumvent the rejection, Dickey inserted in all method claims which did not theretofore contain the same, a new provision that the fabric was pressed against the foam only while the foam was in a supercooled state.[5] He then pointed out to the examiner that this supercooling was an essential feature of the invention not disclosed in any of the prior art references, and that this supercooling permitted lamination of the foam to fabrics which ordinarily would be damaged by the high temperatures necessary to render polyurethane foam adhesive during the proc-

5. It is apparent from the language of the original specifications that the term "supercooled state" contemplated substantial cooling and supercooling to a temperature "below the scorching temperature of the fabric".

ess of lamination. Reference to the file history of the application shows rejections subsequent thereto and continued reliance by the patentee upon the supercooling argument and the related contention of nondisclosure by the prior art of the necessity for sufficient delay between the time the surface of the foam was heated and the foam and fabric were pressed together in order to permit the foam to cool to a supercooled state.

To avoid any technical misunderstanding with respect to the phrase "supercooled state", the patentee made a further claims amendment substituting the word "cooled" for the phrase "supercooled state". The claims as amended provided that the fabric was pressed against the fused foam after cooling to a temperature below the damaging point of the fabric and the fusing temperature of the foam. In so doing the patentee explained that his prior use of the term "supercooling" was inaccurate from a scientific point of view because the supercooling effect was not the result of phase changes but of a chemical decomposition. This change removed any ambiguity that the fused foam did not cool to a point below a temperature injurious to the fabric. These amendments introduced a completely new element to the patentee's claims and are more than an explanation of the lamination process. Dickey admitted this fact by his statement that the Matheson Patent disclosed immediate lamination while his application disclosed sufficient delay for cooling of the foam to a temperature below a point injurious to the fabric, thus indicating that cooling was a positive step in his lamination process.

 An inventor is bound under the doctrine of estoppel by the terms used by him in drafting his claims in order to avoid the state of prior art. In applying this rule this Circuit does not rely upon statements and arguments by the patentee or his solicitors to circumvent the examiner's objections but limits its consideration to those elements or amendments which the patentee was forced to introduce into the claims "in order to avoid rejection". Catalin Corporation of America v. Catalazuli Mfg. Co., 2 Cir. 1935, 79 F.2d 593, 594. See also A. G. Spaulding & Bros. v. John Wanamaker, 2 Cir. 1919, 256 F. 530; Deitel v. Unique Specialty Corp., 2 Cir. 1931, 54 F.2d 359. The Dickey amendments to the claims above described were necessary to avoid rejection and consequently fall within this principle. The plaintiff is therefore barred from asserting that substantial cooling is not critical to the process of the First Patent.

## II

## SECTION 102(a) and (b) AND SECTION 103 DEFENSES

These are the crucial defenses. Only two of the references cited are alleged to be anticipatory patents under § 102(a) and (b), and they happen to be foreign documents. The remainder of the references fall within the category of prior art under § 103. A patent may not be obtained under § 102(a) if the invention was patented or described in a printed publication in a foreign country before the invention by the applicant or under § 102(b) if patented or published more than one year prior to the date of the application for the patent or under § 103 if the differences between the prior art and the subject matter of the application would have been obvious to a person having ordinary skill in the art.

At the outset it is necessary to determine in general what art is involved in the subject matter of the Dickey Patents and, as required by Graham v. John Deere Co., 1966, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, the level of ordinary skill pertaining in that art. Plaintiff contends that the Dickey invention relates to the textile dyeing and finishing art because in that art its usefulness has been most fully exploited. This definition appears too narrow and other arts must be included. Strictly speaking, the subject matter of the invention refers to the art of manufacture and use of polyurethane foam and the art of plastics lamination. No evidence was offered of experimentation by dyers and finishers to develop a lamination of foam and fab-

ric. In fact, Dickey himself worked for a manufacture of polyurethane foam and was attempting to improve the foam's usefulness as carpet underlay by laminating such foam to cloth. Dr. Wilson, defendants' expert witness, also worked in the polyurethane foam art and obtained several patents for laminating polyurethane foam to thermoplastic sheets or films. Because polyurethane foam is a plastic material, it is logical to assume that laminators of other plastic material would be interested in developing a laminate of polyurethane foam and fabric. Manufacturers of polyurethane foam and plastics laminators would therefore be classified as persons skilled in the art. Referring to the Second and Reissue Patents, it is logical to conclude that the relevant artisans would also include those with technological knowledge such as machinery designers and builders.

It is difficult to determine with preciseness what was the level of ordinary skill pertinent to the art above defined in 1956. The art of laminating polyurethane foam had just come into existence and the level of skill in the art must be measured in the framework of reference to the art of plastic lamination and the manufacture of polyurethane foam. One would think that a man of ordinary skill in the pertinent art would be a person with a scientific or engineering background and a practical knowledge of the chemical and physical properties of plastics including plastic lamination processes and some elementary knowledge of thermodynamics and heat transfer principles. While his knowledge of polyurethane foam might not be as extensive as his knowledge of other plastics, he would have a working knowledge of its properties. To utilize this background he would be expected to understand the operation of various machines employed for lamination including the components of such machines, such as burners, drums, guiders, etc.

In determining the scope and content of the prior art at the time of the invention, references in the field may be combined to negate obviousness in order to resolve the question "whether one skilled in the art with the references before him could have made the combination of elements claimed without the exercise of invention" (Application of Shaffer, 43 CCPA 758, 1956, 229 F.2d 476, 479). All prior art references combined in this case are restricted to plastics lamination and the various types of machinery and apparatus engaged to effectuate the process.

### A. First Patent

#### The Gebrauchsmuster as Anticipation

Before analyzing all the prior art references it is proper to adjudicate the effect of the Gebrauchsmuster 1,691,026 (hereinafter referred to as "GM") issued by Germany in January, 1955, which defendants claim falls within the purview of Section 102(a) and (b) and also Section 103 as anticipation and prior art patents. In view of the fact that the Court has determined that the prefiling date of the Dickey invention was no later than March 29, 1956, it is unnecessary to determine the effective date of Austrian Patent 188,906, which under no circumstances could be earlier than April 15, 1956.[6] The questions which arise are whether (1) the GM is a patent within the purview of Section 102(a) and (b); (2) the GM as a patent constitutes anticipation only for what is claimed or also for what is disclosed; and (3) the GM actually anticipates the Dickey invention and to what extent it can be used as prior art under Section 103.

#### The GM is a Patent

A patent has been repeatedly defined as a franchise granting the right to exclude everyone from making, using or selling the patented invention without the permission of the patentee. Bloomer v. McQuewan, et al., 1852, 55 U. S. 539, 549, 14 How. 539, 14 L.Ed. 532; 1 Walker on Patents (Deller's Ed. 1937) § 6 at 22. According to the testimony of the experts, a Gebrauchsmuster is regis-

---

6. The Austrian Patent wase laid open for opposition on April 15, 1956 and finally issued in printed form on March 25, 1957.

tered under the German law after an application filed in the German Patent Office. If the application meets the requirements of form and content, the GM is issued without any novelty search and is accompanied by the publication of an official notice in the German Official Gazette that it has been so issued.[7] There is no requirement of nonobviousness in order to obtain a GM, and its purpose is to enable the applicant to obtain a speedy protection for a new article and if desirable, to concurrently seek a regular patent, a procedure which would consume much more time. After registration the specifications and claims become available to the public and anyone has free and open access to the same. The GM was not a printed publication at any time and is referred to as a utility model. It is limited to a maximum of six years instead of eighteen years, covers only articles and never can cover processes as such, and grants to the inventor the exclusive right to prevent others from making, using or selling his article and also to recover damages for any infringement.

The GM in this case was filed on October 9, 1954 and registered in the German Official Gazette on January 13, 1955, and from then on the applicant obtained all rights thereto appertaining. It is different in form from an American patent but it is divided into two sections, one entitled "Specification" and the other "What is Claimed is". The claims cover lined foam material, in that the lining material, which may be a textile fabric, is bonded directly to the foam material, which may be polyurethane. The specifications describe how the article may be made, from which it appears that the bond is obtained by subjecting the surface of the foam to a short heating process to the softening point of the foam material and immediately bringing the same in contact with the textile and pressing the same onto the foam material. It is stated that heat transfer "through heated metal surfaces such as

heated metal rollers or the like is particularly suited for this purpose. But the required amount of heat can also be introduced by means of a flow of hot gas, by radiation with infrared light or by the application of high frequency current."

By a directive issued to its examiners in 1965, the United States Patent Office resolved certain prior inconsistent practices as to the treatment of GMs and stated that GMs may be considered as patents for anticipation purposes within the purview of Section 102. Official Gazette of the United States Patent Office, Nov. 2, 1965, Vol. 820, No. 1. In American Infra-Red Radiant Co. v. Lambert Industries, Inc., 8 Cir. 1966, 360 F.2d 977, cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144, the court held that a GM was a patent under Section 102(d), citing also Permutit Co. v. Graver Corp., N.D.Ill.1930, 37 F.2d 385, affirmed on other grounds, 43 F.2d 898, affirmed, 1931, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163, and Safety Gas Lighter Co. v. Fischer Bros. & Corwin, D.N.J.1916, 236 F. 955, affirmed, 1918, 247 F. 1005. Plaintiff, however, contends that the words "patented * * * in a foreign country" (as used in Section 102(a) and (b) of Article 35 of the Patent Act of 1952) have been taken without change from several of the prior enactments from as early as the Act of 1836, and that the legislative history of the various patent acts shows that Congress accorded no consideration to the enactment in various foreign countries of Utility Model Laws that came into existence in the latter part of the Nineteenth Century (see Sec. 7, Patent Act of 1836; R.S. 4886 of 1874; R.S. 4886 of 1897; R.S. 4929 of 1902). To support this argument plaintiff cites Permutit v. Wadham, 6 Cir. 1926, 13 F.2d 454; rearg. 15 F.2d 20 (covering the same patent as Permutit Co. v. Graver Corp., supra), which suggested that Congress did not intend to include GMs as foreign patents.

---

7. The notice reading: " 'Kunststoffvertriebsgesellshaft M.B.H.' with limited liability 'Dusseldorf'. Lined foam material, 9th October 1954." was inadequate as a description of the invention.

No place in the Patent Act or elsewhere did Congress indicate that only certain types or classes of patents may be considered under Section 102(a) and (b), and it did not distinguish between one particular type of foreign patent and another. If in effect the foreign document grants a patent right to exclude others from producing, using, or selling the invention, process, or article for a specified period of time, it clearly falls within the accepted definition of a patent which may be considered under Section 102(a) and (b). Accordingly, a GM must be deemed an effective patent under the above section as of its registration date. American Infra-Red Radiant Co., supra, pp. 993–994, supports this postulate.

### The Effect of a GM

Another problem results from the necessity of determining to what extent a GM may be used as an anticipatory reference under Section 102(a) and (b). There is respectable authority to the effect that under this section an American patent is a reference not only for its claims but also for its disclosures as revealed in its specifications. Lanyon v. M. H. Detrick Co., 9 Cir. 1936, 85 F.2d 875, 877; Mershon v. Sprague Specialties Co., 1 Cir. 1937, 92 F.2d 313, cert. denied, 1938, 304 U.S. 561, 58 S.Ct. 943, 82 L.Ed. 1528; 1 Walker on Patents (Deller's Ed.1937) § 51 at 272. But this principle is apparently not applicable to foreign patents which, for anticipation purposes, are limited to their claims and cannot be used as references for the disclosures in their specifications. American Tri-Ergon Corp. v. Paramount Publix Corp., 2 Cir. 1934, 71 F.2d 153, reversed on other grounds, 1935, 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; General Electric Co. v. Alexander, 2 Cir. 1922, 280 F. 852, cert. denied, 260 U.S. 727, 43 S.Ct. 89, 67 L.Ed. 484; Carter Products v. Colgate-

Palmolive Company, D.Md.1955, 130 F. Supp. 557, affirmed, 230 F.2d 855, cert. denied, 1956, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59; Permutit Co. v. Wadham, supra; Leeds & Catlin Co. v. Victor Talking Mach. Co., 1909, 213 U.S. 301, 29 S. Ct. 495, 53 L.Ed. 805. So that what is publicly known or used but not printed in a foreign country is not a bar to an American patent. Defendants rely upon Application of Fuge, 47 CCPA 735, 1959, 272 F.2d 954, and Ex Parte Ovist, P.O. Bd.App.1963, 152 USPQ 709, as authorities to the contrary. Application of Fuge does not reach that far but only holds that a "patent even though it is not a printed publication is a reference to the extent that it protects the rejected invention". 272 F.2d 956. Ex Parte Ovist rests its authority upon *Application of Fuge* without further reasons.[8]

The Court concludes that for anticipation purposes under Section 102 a GM, which is a foreign patent but not a printed publication, is a reference only for w: 't is patented, i. e., for what it claims and not, for what is disclosed in its specifications. This is consistent with the language of Section 102(a) and (b) which juxtaposes 'patented * * * in a foreign country" with the phrase "described in a printed publication in * * * a foreign country". To permit the effect of such a foreign patent to extend beyond what is actually patented, would appear to indirectly effectuate a form of use and knowledge in a foreign country which is not statutorily allowable as an anticipatory reference to an American patent.

### Identity of the GM to the First Dickey Patent

The above observations do not resolve all the issues. While a GM is limited to an article patent, it may so

---

8. There is some language in Helene Curtis Industries v. Sales Affiliates, 2 Cir. 1956, 233 F.2d 148, cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80, which, at first blush, seems to support the defendants' contention with respect to specifications but an examination of the record in the District Court (121 F.Supp. 490 (D.C., 1954)) indicates that the specifications were irrelevant inasmuch as the claims of the foreign patent read directly upon the claims of the American patent so for all intents and purposes, the prior art in both cases was the same.

happen that the article cannot be produced except by several processes, including among others a process involved in an American process patent. Where, however, a process in one patent can produce only one article and that article is definitely covered by what is claimed in another patent, there may be a recognizable identity of the invention in the two patents; but this alone may not be sufficient to treat the article patent as an anticipation of the process patent, if many processes are described in the article patent while only one specific process is described in the process patent. American Tri-Ergon Corp. v. Paramount Publix Corp., supra.

 This is uniquely true with respect to a GM which under German law expressly excludes a process from the area of protection. Nelson v. Wolf, 25 CCPA 1290, 1938, 97 F.2d 632, held that the disclosure of an ordinary foreign patent for a process could be used to support the priority claim by the same party for an article patent in the United States on the ground that the two covered the same invention. United States ex rel. Steinmetz v. Allen, 1903, 192 U.S. 543, 562, 24 S.Ct. 416, 432, 48 L.Ed. 555; James v. Campbell, 1881, 104 U.S. 356, 26 L.Ed. 786. But *Nelson* was concerned with the principles set forth in Section 119 and not with the issue of anticipation as described in Section 102(a) and (b). The statutory concepts in these two sections are entirely different and the policy underlying Section 119 is not the same as that appearing in Section 102, which requires a different approach in the determination of anticipation by a foreign patent. Application of Hilmer, 53 CCPA 1288, 1966, 359 F.2d 859. The Court therefore finds that the GM article patent does not in this case anticipate the subsequent Dickey process patent.

█ To treat the GM as a prior art reference under Section 103 for all it discloses would render the claims restriction of Section 102 meaningless because such treatment would accomplish indirectly what is proscribed directly. The legislative history of Section 103 makes clear that the term "prior art" as used in that section refers only to "what was known before as described in section 102". S.Rep.No.1979, 82 Cong., 2d Sess. (1952) at 6; H.R.Rep.No.1923, 82d Cong., 2 Sess. (1952) at 7, U.S. Congressional and Administrative Code, p. 2399. Therefore, the GM can be treated as a prior art reference under Section 103 only for what is claimed therein.

*Prior Art*

All the prior art references both foreign and domestic appear in Defendants' Exhibit DX–CC [9] and were explained by the testimony of the witnesses. A brief description of the pertinent prior art patents appearing in Exhibit B, appended hereto, discloses: (1) a process of flame heating thermoplastic films to their tacky point and laminating them to other thermoplastic films or to paper or cloth (Abbot and Snyder Patents); (2) a process of superficially heating microporous rubber, which is a cross-linked polymer, to its tacky point and spot welding it to a like piece of rubber or to glass, wood or metal (German Patent 528,758); (3) polyurethane in its non-expanded form can be used as an adhesive (Wilson Patent 3,170,832); (4) a process of *in situ* foaming of polyurethane and consequent bonding to cloth or paper (Marone Patent); (5) a laminate consisting of fabric bonded directly to polyurethane foam material or bonded directly to polyurethane foam material to the edges of the pores at the surface only (GM claims);[10] (6) polyurethane foam can be spot welded to other pieces of polyurethane foam

9. In this exhibit produced only at the end of the trial, defendants reduced the prior art patents relied upon from 50 cited in the Pretrial Order to 25 and also reduced the direct anticipation patents relied upon from 21 to 1.

10. This is a highly restricted and unrealistic use of the GM because an examination of the patent would necessarily include its disclosures, which would reveal that "bonded directly" meant bonded by heat lamination.

(Hacklander Patent); [11] and (7) immediate joinder to the second material of microporous rubber, which has been rendered superficially molten, is unnecessary and can be accomplished any time thereafter (German Patent 528,758).

It was known in the prior art that thermoplastic materials such as those mentioned by Dickey in his original application would assume supercooled states if cooled rapidly (testimony of Dr. Christopher Wilson and Dr. Murray Goodman). Dr. Wilson, defendants' expert, testified that polyurethane foam has and in 1956 was believed to have thermoplastic properties when heated, although Dr. Goodman, plaintiff's expert, disputed this last statement on the ground that polyurethane foam, being a cross-linked polymer, cannot fuse without breaking chemical bonds and will not reform in exactly the same form. It was Dr. Goodman's conclusion that polyurethane foam was a thermosetting rather than a thermoplastic material.

### Claims of Nonobviousness

In substance, plaintiff's arguments that the First Dickey invention was nonobvious are as follows:

Polyurethane foam is a thermosetting rather than thermoplastic polymer. The Albert Patent 2,998,395 teaches that polyurethane foam will completely decompose when ignited. Foam rubber will disintegrate if heat-sealed. These facts all suggest that polyurethane foam would also disintegrate if heated to a temperature sufficient to fluidize the foam and that in any event the foam, if subjected to such heat, would lose some of its desirable qualities such as flexibility, breathability and insulating qualities. None of the prior art patents cited against this patent demonstrate heat lamination of a foam material by fluidizing the foam.

Moreover, the fusing temperatures of all the thermoplastics which are heat laminated to fabrics in the prior art patents are much lower than the fusing temperature of polyurethane foam. For example, the Snyder Patent (the only patent disclosing heat lamination to cloth fabric) refers to a temperature of approximately 200°F. From these known facts a man skilled in the art would conclude that it would be impossible to heat laminate a foam requiring a temperature of 450°F. to fluidize it without damaging the fabrics which are injured at a much lower temperature.

The commercial success of flame laminates of polyurethane foam to fabric (over 100,000,000 yards per year recently) and the recognition in the trade, including the fact that over twenty laminators have taken licenses and paid more than $260,000 in royalties for the year ended June, 1967, all support the claim of nonobviousness.

### Conclusions as to Obviousness

The Court is not persuaded by these arguments but, on the contrary, concludes that the Dickey invention should have been obvious to the man skilled in the art. In coming to this determination, the Court is not unmindful of the statutory presumption of validity under Section 282 and also of defendants' heavy burden of proof; but as stated in Lorenz v. F. W. Woolworth Co., 2 Cir. 1962, 305 F.2d 102, 105, "the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder. * * * We cannot properly allow decisions of that office [Patent] to alter the preponderance of the evidence on the question of validity". Moreover, this presumption is substantially weakened by the failure of the Patent Office to consider the German Patent 528,758, the Hacklander Patent, and the GM.

It was known in the prior art that (1) a large number of thermoplastic mate-

---

11. Although defendants do not rely upon this patent, it is relevant prior art because it was pending in the Patent Office prior to the date of Dickey's invention. Hazeltine Research, Inc. v. Brenner, 1965, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304.

rials could be flame laminated; (2) microporous rubber (a cross-linked polymer) could be heat-welded, and (3) polyurethane foam could be heat-welded to polyurethane foam. From these facts one skilled in the art would believe that polyurethane foam could be made tacky and laminated through the use of heat. While technically polyurethane foam is not a thermoplastic, it is nevertheless a member of the larger plastics family. In 1956 it was assumed by some skilled in the art that polyurethane foam had certain thermoplastic properties. The original Dickey patent application as processed by Curtiss-Wright (skilled in the art) equated polyurethane foam with other thermoplastic substances for the purpose of heat lamination and supercooling.

It was not until May, 1960 that Curtiss-Wright limited the invention to polyurethane foam and explained to the Patent Office that polyurethane foam acted differently than the other materials disclosed in the original application in that it decomposed into simpler elements upon heating and that the so-called "supercooled" phenomenon was caused by this chemical breakdown.[12] Plaintiff refers to the disintegration of foam rubber when heat sealed. But this reference ignores the fact that the Wilson Patent in mentioning foam rubber also discloses that polyurethane is more heat resistant than foam rubber and can be heat sealed. The fact that polyurethane foam would disintegrate or be destroyed upon ignition or intense heating would not compel the conclusion that it could not be made superficially tacky, without disintegration, if the application of heat was controlled. It was known that most plastics, including thermoplastics which were heat laminatable, would also be destroyed if heated above a certain temperature.

There is no doubt that the necessity to fuse the foam to a 450°F. temperature in order to laminate it to a fabric would raise a serious question as to damage to the fabric. But it was known that supercooling was a characteristic of thermoplastics and that lamination of microporous rubber (a cross-linked polymer) could be delayed after heating (German Patent 528,758). While these facts did not specifically demonstrate that polyurethane foam would supercool and if so, the extent thereof, they did suggest that polyurethane foam might possess properties similar to both thermoplastics and microporous rubber and that accordingly damage to the fabric might be avoided in laminating the foam to the fabric by delaying the joinder of the two after heating until the foam cooled. In the heat lamination field it was known that a certain amount of heat could be transferred from a high temperature body to a low temperature body without damage to the latter depending, among other factors, upon the differential in the temperatures, masses of the two materials and the rate of heat transfer. In his remarks to the Patent Office the applicant stated that he "does not claim to have invented heat bonding or to have invented the supercooled state or to have discovered its existence. Applicant has merely made use of the latter phenomenon to arrive at an improved process of heat bonding which makes possible the bonding of textile fabrics to resins such as foamed polyurethane" (p. 24).

It has been frequently recognized that there is no infallible blueprint for the purpose of determining *ex post facto* whether an invention would have been obvious to the hypothetical person skilled in the art. One is required to look backward in order to look forward. The resolution of the issue depends upon a

---

12. This chemical breakdown and the further fact that there might have been a chemical bonding between the foam and fabric as testified by Dr. Goodman does not render the substitution of polyurethane foam for a thermoplastic less obvious because these differences were apparently not known in 1956 to those skilled in the field. See, Aeration Processes v. Walter Kidde Co., 2 Cir. 1948, 170 F.2d 437, 438; see also, Graham v. John Deere Company of Kansas City, supra, 383 U.S. at 25, 86 S.Ct. at 697, where the Court describes an alleged inventive feature as being "an afterthought".

number of facts, circumstances and inferences which when considered as a whole are sufficient to persuade the Court that the invention would have been obvious. The concept here involves the substitution of a new material with some different characteristics for old materials in the art of heat lamination of thermoplastics. The application of an old principle to a new material ordinarily does not involve inventive genius. The faculty of invention involves more than a mechanical skill of combining elements disclosed by the prior art and employing knowledge theretofore available. In this case one would conclude that the person skilled in the art would not have to call upon his inventive facilities to make the simple experiment of attempting to flame laminate polyurethane foam to fabric, and thus solve the problem. Accordingly, the Court concludes that the invention was obvious.

### Simultaneous Invention

█ Any pre-existing doubt concerning the obviousness of the Dickey invention was removed by simultaneous solutions of the same problem as disclosed in the Austrian Patent filed on October 25, 1954, and in the Belgian Patent 549,286 filed on July 5, 1956. The argument against the use of foreign patents in connection with simultaneous invention is predicated upon the claim that in so doing the American inventor is constructively charged with foreign knowledge and use which, as a matter of fact, is barred by Sections 102 and 103. But the subtest of simultaneous invention does not rest upon implied or constructive notice of foreign knowledge or use on the part of the patentee. The significance of the foreign patents upon this issue is not the disclosures contained in the patents as prior art but the fact that the patents are evidence that others reached a solution of the same problem independently and approximately simultaneously. Subsequent domestic patents and publications have been in-

voked as evidence of simultaneous solution. Wilson Athletic G. Mfg. Co. v. Kennedy Sport. G. Mfg. Co., 2 Cir. 1956, 233 F.2d 280; Audio Devices, Inc. v. Armour Research Foundation, etc., 2 Cir. 1961, 293 F.2d 102; Felburn v. New York Central Railroad Company, 6 Cir. 1965, 350 F.2d 416, cert. denied, 1966, 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852; and "Subtests of 'Nonobviousness': A Nontechnical Approach to Patent Validity", 112 U.Pa.L.Rev. 1169, 1181 (1964). There is no reason why the claims in the Austrian and Belgian Patents, although issued subsequent to the Dickey invention,[13] should not be in the same category as domestic inventions or patents for this purpose as evidence tending to negate nonobviousness.

### Estoppel

█ As appears from the discussion under the topic of File Wrapper Estoppel, the plaintiff is estopped to deny the criticality of cooling. Such estoppel is relevant to the issue of patent validity as well as infringement. Graham v. John Deere Company of Kansas City, supra, 383 U.S. at 33–37, 86 S.Ct. at 701–703; AMP Incorporated v. Burndy Corporation, 3 Cir. 1964, 332 F.2d 236, cert. denied, 1964, 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49. As explained hereafter, substantial cooling of the foam prior to lamination is not critical to the lamination of polyurethane foam to fabric without damage to the latter and consequently in considering validity, Dickey's invention must be deemed obvious from the prior art. In describing his process, Dickey mistakenly ascribed the result to the phenomenon of cooling, which is not the reason for the lack of fabric damage. "It is true that a patentee is not required to understand the principle upon which his invention is based [cases] and that he may make errors in describing his method, as long as it does what he claims for it [cases], yet when his alleged invention is a method based upon an untenable principle and

---

13. The Court finds that the filing and not the issue dates are the critical dates for determining simultaneous invention.

which cannot accomplish the purposes claimed for it, it cannot be patented." Cowles Co. v. Frost White Paper Mills, S.D.N.Y.1948, 77 F.Supp. 124, 129, affirmed, 2 Cir. 1949, 174 F.2d 868.

### Subtests of Patentability

Plaintiff emphasizes the conventional subtests of patentability, referring to the need and demand in the industry for this new laminate and its commercial success as witnessed by plaintiff's licensing program. Subtests, including commercial success, are not a substitute for an invention. Having found the First Dickey invention obvious, it is unnecessary to dwell upon these tests (Kerr v. State Farm Life Insurance Company, 2 Cir. 1967, 373 F.2d 62), which incidentally do not cut unequivocably in favor of the plaintiff, since the problem was not one of long standing in the art. See, Goodyear Tire and Rubber Co. v. Ladd, Comr. Pats., D.C.D.C.1963, 224 F.Supp. 781, affirmed, D.C.Cir. 1965, 349 F.2d 710.

### B. *Second and Reissue Dickey Patents*

The essence of these two patents appears in the preheating claim (Claim 1 of the Second and Reissue Patents) and in the so-called anti-wrinkling claims (Claims 2–8 of the Second Patent and Claims 2–8 and 10–13 of the Reissue Patent).

### *Invalidity of Claim 1 (Preheating) under § 103*

The purpose of preheating was to strengthen the bond, but preheating was obvious from the prior art patents disclosed in Exhibit C, attached hereto, particularly since the preheating claim is generic and not specific. The most relevant patents [14] are Yanulis, Snyder, Francis and Austrian. Yanulis teaches the preheating of a paper or cloth back-ing material in order to eliminate moisture and *to improve adhesion.* Although Yanulis involves an extrusion coating process, the Snyder, Francis and Austrian patents also mention the preheating of paper, textile, and cloth secondary materials in the heat lamination of films and foams. According to Dr. Wilson the concept of preheating was an old one and if fused foam chilled too rapidly upon contact with the fabric, the obvious solution would be to add heat to the fabric. This testimony is plausible and is accepted. Since the claim is invalid because of obviousness, the defense of anticipation under Section 102 by the Austrian Patent need not be considered.

### *Invalidity of Claims 2–8 and 10–13 (anti-wrinkling) under § 103*

Claims 2–8 and 10–13 relate to tensioning of the foam over a drum prior to lamination in order to eliminate wrinkling caused by the differential in thermal expansion of the foam upon heating. Although they are invalid also because of obviousness, they require a somewhat more detailed discussion.

### *Prior Art*

A brief reference to the teachings of the pertinent prior art patents in Exhibit D, hereto annexed, reveals: (1) the lamination of two or more sheets of rubber hydrochloride film by heat and pressure indicating that the wrinkling problem could be solved by stretching the films longitudinally to a slight degree to cause the films to lie perfectly flat against the laminating drums (Mallory); (2) an apparatus and method of lamination of film to fabric (not addressed to the wrinkling problem) virtually identical to that described in plaintiff's anti-wrinkling claims except with respect to elements unrelated to wrinkling (Snyder); [15] (3) the utilization of

---

14. In the Strable Patent the problem was expressly recognized that a bond of bitumen with boards would be strengthened by preheating the boards. This teaching was not considered because it was doubtful whether the field was relevant.

15. The similarity of Snyder's machine to defendants' machine appears in Figure 1 of PX–64C, attached hereto as Exhibit E.

drums to tension webs of materials in heat lamination processes without purporting to eliminate wrinkling (Abbot, Francis and Aykanian); (4) application of flame or heat to the first material while said material is held in tension on a laminating drum (Abbot and Francis); and (5) stretching under tension of foam or sponge rubber or other backing material around a drum assisted by frictional engagement of the web of material with the drum during an adhesive lamination process so that the backing will later contract when removed from the drum and the yarn piles which are laminated thereto will thereby open up (Schock).

The Snyder Patent is quite close to the Dickey Patent, although it does not purport to solve the wrinkling problem. Figure 1 of Snyder illustrates all of the features of the apparatus and method claims relevant to wrinkling, such as the feeding of the web material downward under tension onto and at least partially around the periphery of a horizontally rotating drum in frictional engagement therewith, the application of heat to the web while the web is in longitudinal tension on the drum, at a point arcuately removed from the point of first contact of the web with the drum, and the contacting of the fabric web to the first web while the fabric web is also under longitudinal tension.

Snyder differs from Claims 2–13 of the Dickey Patent in that it fails to provide for (a) a water-cooled drum; (b) further arcuate travel of the laminate after it leaves the nip; (c) a take-up guide roller and passage of the laminate partially around the same, and (d) intense heat in a narrow band contacting the foam at a point arcuately removed from the point of initial contact of the

foam with the fabric. But these omissions are unimportant because unrelated to the solution of the wrinkling problem. These features also appear to be old in the art and their combination obvious.[16]

### Obviousness

▉▉ A comparison of the Second Dickey invention (disclosed in his Second and Reissue Patents) with the prior art disclosed in the above described patents reveals that all the pertinent elements employed by Dickey had been theretofore utilized, although not to solve the same problem. New uses of old elements or devices will be carefully scrutinized by the courts to determine if the new use is really nonobvious. See, General Electric Co. v. Jewel Incandescent Lamp Co., 1945, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43. As stated in General Radio Company v. Superior Electric Company, 3 Cir. 1963, 321 F.2d 857, 862, "Where, as here, the allegedly novel feature of the claimed invention is a structural element substantially similar to one of the prior art, even though its function may be different, the similarity is sufficient to negative patentability". In combination the Snyder and Mallory Patents solve the wrinkling problem in the heat lamination of films through the use of tension and stretching to produce a flat lie of films upon a laminating drum. While the use of foam might accentuate the wrinkling, the above teachings would make obvious to one skilled in the art the process and apparatus utilized by Dickey to eliminate wrinkling in foam.

▉ The apparatus claims are admittedly combination claims. Since the process claims are intimately interwoven with the apparatus claims, they would share a similar fate. Not only were the elements theretofore known but, in fact, the combination itself was known. "Ele-

16. Francis, Yanulis and Kreidl include the use of cooled drums. Schock, Francis and Yanulis refer to use of further arcuate travel but not for the purpose of substituting lamination at the nip, the elimination of which the Court believes would be obvious from disclosures of prior art. Plaintiff admits that such travel after

the nip is unnecessary in flame lamination processes (Post-Trial Brief, Sec. 4, p. 8). Abbot provides for use of gas-air burners; Dickey contemplated the use of commercial burners such as the Flynn burner, and Snyder can be interpreted to include the use of a narrow band of intense heat.

ments may, of course, especially in chemistry or electronics, take on some new *quality or function from being brought into concert,* but this is not a usual result of uniting elements old in mechanics" (Great Atlantic & P. Tea Co. v. Supermarkets Eq. Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162). And it is not the result here. The Dickey apparatus assumes no new quality or function and the concert is essentially the same as in Snyder. It is old law that an assembly of old elements, in order to be patentable, must make a contribution to the art so that the accumulation of old devices exceeds the sum of its parts. Great Atlantic & P. Tea Co., supra. Such contribution was not present in Claims 2–13 of Dickey's second invention.[17]

## III

### INFRINGEMENT OF THE DICKEY PATENTS

#### A. *First Dickey Patent*

The process employed by the defendants on their machine (PX–64C attached hereto as Exhibit E) is equivalent, if not identical, in all respects to the process claimed in the first Dickey patent except in one crucial point. The Dickey patent claims that the fused polyurethane foam surface cools substantially prior to the initial contact of the foam with the fabric. As earlier observed, the plaintiff is estopped by the file wrapper from denying in the determination of infringement that this phenomenon is crucial and that there is no equivalency in a process without cooling.

#### *Cooling*

Upon the cooling claim, neither the plaintiff nor the defendants presented any direct measurable or quantitative evidence as to whether the cooling of the foam actually takes place. The testimony of witnesses of both parties was based solely upon inferences of the various experts deduced from observed facts and heat transfer and heat balance calculations and since this vitally important question is not subject to rigorous analysis, it is necessary to consider the theories advanced by both parties.

#### *Plaintiff's Theory*

Plaintiff relies primarily upon tests it has taken of the process employed by defendants on their machine, which incidentally plaintiff claims also infringes its second patent. In defendants' process the fused surface of the polyurethane foam is heated by the flame emanating from the ribbon gas burner to a temperature between 500–590°F. Plaintiff contends that the foam cools prior to the point of initial contact with the fabric from the high temperature of 500–590°F. to some point below 300°F., which is the damage temperature of many fabrics; and that cooling is evident from the fact that the fabric shows no damage from the lamination process. To support this theory plaintiff relies upon (1) a microscopic examination of partially delaminated samples, run on defendants' machine using Nylon 66 and a mixture of cotton and acetate; (2) the use of Tempilaq, and (3) a heat transfer analysis.

These partial delaminates, according to the plaintiff, indicate that there was no damage to the filaments [18] of the nylon or cotton-acetate and that in some cases there were single filaments of the fabric embedded in solid globules of fused polyurethane many times the mass of the filament. From this the plaintiff concluded that the melted globules of the fused portion of the foam encased or enclosed single filaments of the fabric upon initial contact of the foam to the fabric before the nip in the process of

---

17. Plaintiff relies upon the presumption of validity. The presumption in this case was completely rebutted by the evidence. It also appears that the Patent Office failed to consider the Snyder Patent and that the basic claims, 2–13, were finally allowed only after Dickey emphasized that the primary feature of the invention was further arcuate travel after lamination (pp. 47–49).

18. For simplicity, reference to filaments will include fibers. Synthetic fabrics consist of filaments; natural fabrics consist of fibers.

lamination and that according to accepted heat balance considerations, if the fused foam had not cooled to a point below 300° F. at the time of this contact, the filaments of the fabric would have been substantially damaged. In support of this claim plaintiff points out that the transfer of the heat from the fused foam to the embedded filaments could be accomplished in 1/1000th of a second and that the thermal conductivity of the filament is so low that no substantial amount of heat could have escaped from the filament into the body of the fabric.

To buttress these conclusions plaintiff also made certain tests at defendants' plant with Tempilaq heat-sensitive materials.[19] Tempilaq, in ratings of 175 to 450°F. in 25 degree intervals, was applied in thin strips across the surface of the nylon fabric which was laminated to the foam. After cooling, individual crystals of Tempilaq which had become embedded in foam globules were examined under a stereoscopic microscope to determine if any of the crystals had melted. These test results as reported in plaintiff's Exhibit 69, indicated that there had been at most incipient melting of the 175°F. Tempilaq. Employing accepted heat balance equations predicated upon an equilibrium temperature of 175°F. obtained from this Tempilaq reading, plaintiff calculated that the maximum temperature of the foam at the point of first contact with the fabric was less than 280°F. (Plaintiff's Exhibits 71 and 73).

To further establish plaintiff's theory of substantial prior cooling of the foam, its heat transfer expert made a heat transfer analysis and calculation of cooling factors in defendants' system predicated upon his opinion after observing the flame from the burner, that there was no substantial heating below the exit holes of the burner.[20] He concluded that the foam would cool between 325 and 375°F. prior to the point of initial contact with the fabric and that the major sources of heat loss in the system were (1) net cooling by radiation of 100–125° F., (2) cooling of 70°F. caused by a boundary layer of air brought in on the fabric web, (3) cooling by conduction to the back of the foam of 60–100°F., and (4) the remainder of the cooling resulting from an endothermic reaction when the foam decomposes and from the motion of the free isocyanate ends.

### Defendants' Theory

Defendants agree that the fused foam is heated to a temperature between 500 and 590°F. but they differ with the plaintiff upon the following: (1) The conclusions from the delaminates; (2) the use of Tempilaq as a measuring device; and (3) Plaintiff's heat transfer analysis.

It is the defendants' position that the partial delaminated samples do not show single filaments embedded in globules many times the mass of the filament but that, on the contrary, an examination of the delaminates shows that the fused polyurethane contacts groups of yarns or filaments and that the mass of the fabric at the point of initial contact is greater than the confronting mass of the fused foam. They postulate that according to accepted heat balance considerations the temperature of the foam at the point of initial contact with the fabric

19. Tempilaq materials are crystalline solids having predetermined melting points at various temperature ratings, each rating being capable, in normal and proper use, of indicating whether or not it has reached its rated temperature by showing a permanent change in appearance, even after subsequent cooling.

In normal use Tempilaq is applied as a thin film on an air exposed surface of the object whose temperature is to be measured and in small quantities relative to the weight of that object. The normal method of determining melting is to view the entire surface with the naked eye and if there has been melting, the crystals of Tempilaq will blend together, changing its appearance from opaque to translucent or shiny.

20. However, he took no pyrometer readings of the temperature of the gases in the area below the burner upon the theory that such readings would be inaccurate, which conclusion was disputed by the defendants who took such readings.

could have been over 500°F. without damaging the fabric.

Defendants claim that the use of Tempilaq under the circumstances was improper to test the temperature of the foam at the point of initial contact because the Tempilaq crystal is a measuring rod only when it can be viewed with the naked eye and that since it will reform into its original shape after cooling it is impossible by the process of delamination to determine whether the crystal ever melted or melted and thereafter cooled and reformed into its original shape. They further contend that even if Tempilaq could be properly used for such a test, the values assigned by plaintiff in its heat balance equation (Plaintiff's Exhibits 71 and 73) were improper.

Plaintiff's heat transfer analysis is also challenged by defendants on the ground that upon defendants' machine the whole area from the burner to the point of initial contact of foam and fabric is a large inferno of flame, thus preventing any net cooling of the foam because it is exposed to the same heating and cooling factors during its entire travel around the drum from the burner to the point of initial contact of foam and fabric. Defendants' expert was specific in denying any cooling arising from endothermic reaction for the reason that the heat supplied to initiate and continue the reaction offsets any resulting cooling effect.

### Court's Expert

In view of this conflict the Court appointed, with the consent of both parties, an independent expert, Dr. Glenn C. Williams, Professor of Chemical Engineering, Massachusetts Institute of Technology, an authority whose expertise in the field of heat transfer was recognized by both plaintiff and defendants. His testimony on the three crucial points may be summarized as follows:

(1) From an examination of undelaminated samples the foam does not penetrate the fabric any more than a few fibers deep and there are examples where individual filaments appear to be embedded in foam globules many times the mass of the filaments. While no imperative explanation was offered as to why the filaments indicated no damage, the following possibilities were suggested:

No one can determine whether the filaments became embedded in the foam globules at the moment of initial contact or later in the nip. If the enclosure of the globules around the filaments took place in the nip when the laminate was under considerable pressure, then the heat from the globules would be siphoned off into the drum and fabric sufficiently fast to prevent damage to the filaments or fabric even though the temperature of the foam globules was far above the damage temperature of the fibers or filaments.

The filaments could have been heated above the damage points for a very brief period without showing damage if they cooled rapidly thereafter.

(2) It is impossible to read single Tempilaq particles under circumstances of plaintiff's test because it is characteristic of crystalline structures after melting to return to their original shape after cooling unless they coalesce with other similarly melted crystals. In his examination of individual crystals of Tempilaq embedded in foam after a test more rigorous than the plaintiff's experiment, he was unable to distinguish between unmelted and melted Tempilaq that had been resolidified.

(3) Plaintiff's heat transfer analysis is inaccurate because the foam required at least four inches of travel on the defendants' machine to transfer 200,000 BTU's of heat necessary to raise the fused layer of foam to its melting or fusing point of 600°F. In making this calculation it was necessary to take into account the fact that at the time of the heat transfer the remaining unfused portion of the foam would be raised to an average temperature midway between room temperature of 70°F. and fused foam temperature of 600°F. Since the foam and fabric were travelling around

the arc of the drums at the rate of 24 inches per second, this would leave on the defendants' machine only one inch at most or expressed in seconds, one twenty-fourth of a second in which the net cooling of the foam could occur. Cooling of the foam occurs by conduction of heat through the foam to Drum M and also by radiation in the system at the rate of 1200°F. per second. If the foam were at an original temperature of 670° F., this would permit 50°F. cooling before lamination. Assuming that the foam had almost three inches to cool as it travelled around Drum M (3/27th of a second) as hypothesized by plaintiff's expert in his calculation, the maximum cooling that could be calculated by heat transfer principles would only be 100°F. assuming the foam reached 670°F. and only 60°F. assuming the foam reached only 600°F. Consequently, the temperature of the foam at the point of initial contact with the fabric, based upon the plaintiff's assumption, would not be lower than 570°F. or 540°F., respectively.[21]

### Court's Conclusion

■ The solution of the problem is not subject to empirical observation and experimentation and the theories of both parties are predicated to some extent upon assumptions. In the absence of any objective evidence as to the temperature of the foam at the time of its initial contact with the fabric, the Court is compelled to decide between opinions of experts. The most important argument in favor of plaintiff's contention of cooling is the absence of damage to the fabric upon lamination in spite of the fact that the temperature of the fused foam had reached between 500 and 590° F. after it had passed under the burner and that the damage temperature of the

fabric was 300°F. The Court is convinced, however, that Dr. Williams' deductions are correct and that there is no possibility of substantial cooling in the defendants' system prior to the point of initial contact of the foam with the fabric and that at the most there was no more than 50°F. cooling of the fused foam at the time of the initial contact with the fabric and that this cooling is not below the fusing temperature of the foam or the damage temperature of the fabric.

Having concluded that there is no substantial cooling, it is unnecessary for the Court to find an explanation for the lack of fabric damage and the Court makes no such finding. Consistent however, with the Court's conclusion, plausible explanations may be offered. One explanation appears from the evidence that large, solid globules of fused foam many times the mass of the filament do not enclose or encase such filaments upon the initial contact of foam and filament as postulated by plaintiff, but that the fused foam contacts and wraps partially around groups of several filaments or of yarns in the nip and that at the time of lamination the mass of fabric in contact with the foam is greater than the mass of fused foam. Another explanation appears from Dr. Williams' testimony that even if the foam globule encased a single filament and this took place in the nip, the heat of the foam could be siphoned off into the laminating drums and the body of the fabric sufficiently fast to avoid damage to the fabric.[22]

### B. Second and Reissue Dickey Patents

The Court concludes that defendants' process infringed the preheating claim even though preheating was not utilized

21. Dr. Williams also testified that immediately prior to the point of initial contact of foam and fabric some minimal cooling occurred from the cool air which was squeezed out of the interstices of the foam and fabric back into the heating chamber and from the loss of heat to Drum M by conduction, but the amount was too small to affect Dr. Williams' conclusion that the foam was not less than 540°F. at the point of contact.

22. The delaminates are not contradictory since their revelation is ambiguous and consequently they neither show the condition of the laminate before delamination nor when or where enclosure of the filaments took place.

to minimize chilling. The hot gases emanating from the defendants' burner and trapped in the area below significantly preheated the body of the fabric and especially the confronting surface and were a distinct aid in stabilizing the bond.[23]

Defendants contend that their apparatus and method do not infringe the features embodied in Claims 2–8 of the Second Patent and 2–13 of the Reissue Patent because (a) intense heat in a narrow band is not directed across the extent of the drum; (b) the two webs are not contacted at a point arcuately removed from the band of application of heat, and (c) the laminate is not held in tension against the foam drum for the purpose of adjusting the joined materials during the setting of the adhesive.

As a practical matter the language "means for directing intense heat in a narrow band" (appartus claims) and "directing intense heat in a narrow band" (method claims) refers to a band of heat at the source rather than at its destination. Consequently a burner satisfies the language of the claims if it is a means for and directs intense heat in a narrow band even though the gases emanating from the burner spread upon contact with the drum and heat the foam over a considerable portion of its arcuate travel. Obviously the heat must bounce and spread upon such contact, the extent depending upon such factors as the velocity of the gas emanating from the burner jets and the richness of the air-gas mixture.

Even assuming a broader band of heat at the destination rather than at the source, the two webs are contacted at a point lower than and arcuately removed from the band of application of heat. The foam is not continually heated to the point of initial contact but there is an inch of arcuate travel of the foam between the end of heating and the point of initial contact of the two webs during which cooling occurs. Adopting the above interpretation of narrow band of heat as meaning the band at the source, it becomes obvious that the point of contact is lower than and arcuately removed from the band.

Defendants state that at first their laminate was drawn straight out and later was held in tension against the drum for further arcuate travel. But they assert that this tension was not for the purpose of setting the laminate, did not affect the quality of the laminate, and was subsequently abandoned. They postulate that this feature is critical to the invention and that the plaintiff cannot resort to the doctrine of equivalence because of file wrapper estoppel. Since Claims 2–8 of the Second Patent and 2–12 of the Reissue Patent were not narrowed for the purpose of avoiding rejection but were simply restated to eliminate ambiguity, there was no file wrapper estoppel. A more serious question is presented, however, by the fact that the provision for further arcuate travel was asserted as essential to effectuate the laminate. Thus the laminate is accomplished by tension of the foam and fabric around a laminating drum and not by pressure of the two drums at the nip, one carrying the foam and the other the fabric.[24]

---

**23.** Because there is no significant cooling of the foam prior to lamination in defendants' process, preheating to minimize chilling of the fused foam may be unnecessary to improve bond strength, but defendants failed to produce any evidence that preheating from the gases did not improve the bond.

**24.** The specifications of the patent state that the roller carrying the fabric is located so that its surface adjacent to the laminating drum is spaced from that surface "in an amount at least slightly greater than the combined thicknesses" of the two webs (Col. 3, lines 34–38) and further state that the further arcuate travel allows the layers to adjust to stable bonded positions (Col. 1, lines 25–33) and, by eliminating a nip roll, removes the tendency for the drum to become coated with the material of the foam (Col. 5, lines 10–21). In support of the final amendment before allowance, the patentee stated that the central feature of the invention was the provision for further arcuate travel (p. 49).

Defendants' machine uses the pressure of two drums at the nip to accomplish lamination. For a time defendants held their laminate in tension after lamination for the purpose of adding silicone to the laminate. In other words, it was unnecessary to their lamination. The provisions for both further arcuate travel and anti-wrinkling are combined in composite claims. These features appear to be separate improvements which might have been better protected in separate claims. Since further arcuate travel was an essential feature of plaintiff's patent and an unessential operation of defendants' machine, the Court finds that defendants' apparatus did not infringe Claims 2–8 of the Second Patent and Claims 2–12 of the Reissue Patent. See, Nickerson v. Bearfoot Sole Company, 6 Cir. 1963, 311 F.2d 858.

Claim 13 of the Reissue Patent is the only claim that relates solely to anti-wrinkling. But the Reissue Patent was not issued until December 10, 1963, over two years after October, 1961, the date defendants began using their apparatus and practicing their method of laminating foam to fabric.[25] Since defendants' machine did not infringe Claims 2–8 of the Second Patent, the defendants acquired intervening rights as of October, 1961, with respect to Claim 13 and hence cannot be deemed infringers of this claim. Sontag Chain Stores Co. v. National Nut Co., 1940, 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204.

IV

PERSONAL LIABILITY OF TRAVIS RAUCH

In view of the Court's finding that the corporate defendant is not liable, it follows that defendant Rauch is also free from liability. However, in order to complete the fact-finding process in the event that the Appellate Court reaches a different conclusion as to corporate liability, the Court will consider Rauch's personal liability. Rauch was not a majority and controlling shareholder until October, 1965. Before that time he was the directing genius of the corporate defendant's operation, subject as an agent at all times to the direction and control of the majority shareholders and the Board of Directors. He conducted no operations except in his capacity as an officer of the corporation. Consequently, until that date, he was not individually liable. Upjohn Company v. Italian Drugs Importing Co., S.D.N.Y.1961, 190 F. Supp. 361. After October, 1965, however, he became sole shareholder and continued as the person completely responsible for and in direct control of the operation of the business. He then assumed the capacity of principal as well as agent and in this dual role he was equally liable with the corporation for damages resulting from any infringement of plaintiff's patents. Rich Products Corporation v. Mitchel Foods, Inc., W.D.N.Y.1965, 246 F.Supp. 392, affirmed, 1966, 357 F.2d 176, cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58.

V

ATTORNEY'S FEES

Plaintiff has requested an award of attorney's fees. The statute provides that attorney's fees may be awarded only to a prevailing party in exceptional cases. 35 U.S.C.A. § 285. Plaintiff is not the prevailing party, and accordingly the Court has no power to grant such an award to the plaintiff. See, Delamere Company v. Taylor-Bell Co., S.D.N.Y.1966, 249 F.Supp. 471; Formal Fashions, Inc. v. Braiman Bows, Inc., S.D.N.Y.1966, 254 F.Supp. 389, affirmed, 2 Cir., 369 F.2d 536.

VI

SUMMARY OF CONCLUSIONS

The above constitutes the Court's findings of fact and conclusions of law which, in substance, may be summarized as follows: (1) All claims of the First Patent are invalid as obvious under Section 103; (2) all claims of the First Patent are also invalid since plaintiff is estopped to

---

25. Illustrated in Exhibit E.

deny that substantial cooling of the foam prior to lamination is an essential element of the patent, whereas such cooling is not critical to lamination of polyurethane foam to fabric; (3) all claims of the Second and Reissue Patents are invalid as obvious under Section 103; (4) since there is no substantial cooling of the foam prior to lamination upon defendants' machine, defendants do not infringe any claims of the First Patent; (5) defendants do not infringe Claims 2–8 of the Second Patent and Claims 2–8 and 10–13 of the Reissue Patent because their apparatus and method do not utilize further arcuate travel to aid in adjusting and setting the laminate; (6) defendants do not infringe Claim 13 of the Reissue Patent because they possess intervening rights with respect to Claim 13, and (7) defendants do infringe Claim 1 of the Second and Reissue Patents.

Judgment for the defendants is ordered accordingly. Submit order within twenty (20) days upon ten (10) days' notice.

EXHIBIT A

Oct. 9, 1962 J. W. DICKEY 3,057,766
METHOD AND APPARATUS FOR FORMING LAMINATED
STRUCTURE OF ADHERED MATERIALS
Filed Sept. 23, 1957

EXHIBIT B

Prior Art Cited Against the First Dickey Patent

| Patents | Material 1 | Material 2 | Method | Other Relevant Teachings |
|---|---|---|---|---|
| Matheson *<br>2,521,476 | Cellular thermo-plastic materials, particularly of vinyl aromatic resins. | Laminated to itself or to wood, leather or metal. | Exposure to chemical vapors. Surface temperature of Material 1 may rise as high as 310°F. as a result thereof. | Refers to possibility but inconvenience and difficulty of heat lamination, in which the two materials are immediately pressed together after heating. |
| Marone *<br>German Pat.<br>842,267 | Polyurethane foam but may also use foams of natural or synthetic rubber, thermoplastics or thermosetting resins. | Cloth belt of any fabric desired or paper. | *In situ* foaming | |
| German Pat.<br>528,758 | Microporous rubber | Laminated to itself or glass, wood, metal, etc. | Superficial heating of the rubber, possible with hot iron. | Not necessary to join the superficially molten parts immediately after the heat treatment, but joinder can be at any time thereafter. Covers laminated joints rather than webs of material. |
| Snyder<br>2,293,568 | Film of heat-sealable material such as rubber hydrochloride, cellulose esters and vinyl derivatives. | Paper or cloth | Heating by hot air or small gas flame. Fusing temperature of Material 1 is about 200°F. | |
| Abbot<br>2,398,398 | Thermoplastic substances like vinyl chloride, polyvinyl acetate. | Laminated to itself. | Flame lamination | Use of non-contiguous flame across extent of web and hence non-contiguous bonding. |
| Gebrauchsmuster<br>Claims<br>1,691,026 ** | Polyurethane foam | Porous lining materials, textiles. | Direct bonding | Claims describe the article produced, not the process of lamination except by inference arising from its reference to direct bonding. |

EXHIBIT B—Continued

Prior Art Cited Against the First Dickey Patent—Continued

| Patents | Material 1 | Material 2 | Method | Other Relevant Teachings |
|---|---|---|---|---|
| Wilson 3,170,832 *** | Polyurethane foam | Thermoplastic film-forming resin. | Dialectic heat-sealing machine | No teaching that polyurethane foam is fused in the heat sealing operation. |
| Hacklander 2,878,153 | Resilient expanded plastic, especially expanded polyurethane. | Laminated to a piece of similar material. | Welding of the compressed foam pieces at the edges. | Involves pieces of foam to be used for cushions, etc. rather than webs of material. Fig. 22 also discloses the inclusion of a thermoplastic fabric in the laminate structure. |

\* Cited by the Patent Office.

\*\* Limited to its claims for purposes of prior art.

\*\*\* Patent also reveals a method of lamination using non-foamed polyurethane as an adhesive.

**EXHIBIT C**

Prior Art Cited Against the Second and Reissue Dickey Patents—Claim 1

| Patents | Material 1 | Material 2 | Method | Preheating |
|---|---|---|---|---|
| Snyder 2,293,568 | Film of heat-sealable material such as rubber hydrochloride, cellulose esters and vinyl derivatives. | Paper or cloth | Heating by hot air or small gas flame. Temperature at lamination is about 200°F. | When using hot air heating, provides for the alternative of heating Material 2 as well as Material 1 prior to lamination. |
| Francis 2,657,157 | Thermoplastic film-forming material | Woven silk ribbon or non-woven fabrics of felt-like or paper-like character. | Heating by heat lamps and a hot drum. | Heat Lamps are used to heat both Material 1 and Material 2 prior to lamination. |
| Austrian 188,906 | Foam substances, in particular synthetic resin foams. | Textiles or other materials. | Heat lamination | Provides the alternative procedures of heating Material 2 instead of or in conjunction with Material 1. |
| Strable 2,377,979 | Bitumen felt and like materials. | Plaster boards | Flame lamination | The upper surface of the boards in passing beneath the flame is preheated sufficiently to prevent premature hardening of the tacky surface of the bitumen when it meets the boards and in this way the strength of the bond is increased. |
| Aykanian * 3,062,698 | Foamed thermoplastic resins, particularly polystyrene foam. | Paper and textile materials. | Heat lamination, especially by a platen press heated to 340°F. | Material 2 is heated above the melting point of Material 1 prior to lamination and its heat is used to melt Material 1. |
| Yanulis 2,944,586 | Plastic materials, particularly polyethylene. | Paper, cloth, etc. | Extrusion coating. | Preheating of Material 2 prior to lamination to eliminate moisture and improve adhesion of coating material. |

* Before Patent Office.

EXHIBIT D

Prior Art Cited Against the Second and Reissue Dickey Patents—Claims 2–13

| Patents | Material 1 | Material 2 | Method | Tension or Stretching | Further Arcuate Travel | Cooled Drum |
|---|---|---|---|---|---|---|
| Mallory * 2,351,350 | Rubber hydrochloride film | Laminated to itself | Heat and pressure lamination | Tensioning films over drums to reduce bagging and wrinkling. | | |
| Schock 2,768,671 | Stretchable material such as natural or synthetic rubber or foam or sponge rubber. | Pile Fabric | Adhesive lamination | Material 1 is stretched under tension around a drum by frictional engagement therewith during lamination so that backing will later contract and thereby open up yarns | Further arcuate travel around drum by continuous pressure engagement of yarn with backing allows setting of laminate. | |
| Snyder 2,293,568 | Film of heat-sealable material such as rubber hydrochloride, cellulose esters and vinyl derivatives. | Paper or cloth | Heating by hot air or small gas flame. | Film and fabric are both under continuous tension during lamination process. Heat applied while webs are on drums. | | |
| Strable 2,377,979 | Bitumen felt or like materials. | Plaster boards | Flame lamination by tube-style gas burner. | Stretching of Material 1 and tensioning about drums to avoid risk of subsequent corrugation. Heat applied to Material 1 while web is on drum. | | Water-cooled drums |
| Abbot 2,398,398 | Thermoplastic substances like vinyl chloride, polyvinyl acetate. | Laminated to itself. | Flame lamination. Interrupted flame and non-contiguous bonding. | Webs are brought together and laminated while they are under tension. Flame applied while webs are on drums. | | |

282 F.Supp.—10½'

EXHIBIT D—Continued

Prior Art Cited Against the Second and Reissue Dickey Patents—Claims 2-13

| Patents | Material 1 | Material 2 | Method | Tension or Stretching | Further Arcuate Travel | Cooled Drum |
|---|---|---|---|---|---|---|
| Francis 2,657,157 | Thermoplastic film-forming material. | Woven silk ribbon or non-woven fabrics of felt-like or paper-like character. | Heating by heat lamps and hot drum. | Materials 1 and 2 are held in tension prior to and during lamination process. | Further arcuate travel during which the laminate is pressed against the drum by means of belt arrangement to aid bonding. | Air-cooled nip roll or drum. |
| Yanulis 2,944,586 | Plastic materials, particularly polyethylene. | Paper, cloth, etc. | Extrusion coating | Material 2 is under tension throughout laminating process. | Arcuate travel around drum of approximately 180 degrees to set laminate. | Water-cooled drum. |
| Aykanian ** 3,062,698 | Foamed thermoplastic resins, particularly polystyrene foam. | Paper, textile materials. | Heat lamination by a platen press heated to 340°F. | Material 2 is tensioned and forced into pressured engagement with Material 1. | | |
| Kreidl ** 2,632,921 | Polyethylene plastics | Ink materials | Patent related to preparation of Material 1 and does not show any bond method. | Material 1 is tensioned around drums and surface is heated by gas burner while web is on drum in tension. | | Fluid-cooled drum. |

\* Similar to the related *Young* Patent which was before Patent Office.
\*\* Before Patent Office.

U.S. LAMINATING CORP.
247 WEST MAIN ST.
PATCHOGUE, L.I., N.Y.

FIGURE NO. I